[Civ. No. 33357. Second Dist., Div. Five. Apr. 28, 1970.]

HUGO NEU CORPORATION et al., Plaintiffs and Respondents, v. COUNTY OF LOS ANGELES et al., Defendant and Appellants.

**COUNSEL**

John D. Maharg, County Counsel, and DeWitt W. Clinton, Deputy County Counsel, for Defendants and Appellants.

Buchalter, Nemer, Fields & Savitch, Stuart D. Buchalter, Cary D. Cooper and Benjamin E. King for Plaintiffs and Respondents.

**OPINION**

**KAUS, P. J.**—The issue presented in this appeal is whether certain scrap metal which was awaiting shipment to Japan had entered the export stream and thus was exempt under the export clause of the federal Constitution (art. I, § 10, cl. 2) from an ad valorem property tax levied by defendants.

In 1961 plaintiff Hugo Neu Corporation entered into a sales contract with a group of Japanese steel mills under which Hugo Neu Corporation

agreed to ship to the Japanese group in Japan 20,000 long tons of "Proler Scrap" per month for five years, commencing not later than June 28, 1962. In 1962 Hugo Neu and Proler Steel Corporation formed a joint venture and began doing business under the name of Hugo Neu-Proler Company. A plant facility was constructed at Terminal Island, Los Angeles for the exclusive purpose of processing steel scrap for the contract.[1] The plant was designed to produce about 20,000 long tons of Proler Scrap per month. Since operations commenced in January 1963, no scrap has been processed at the plant for domestic sale or use. The total output of the facility has been shipped to the Japanese group under the contract.

Plaintiffs obtain raw steel scrap for "prolerizing" from various sources. Upon delivery to the facility the raw material is sometimes fed directly into the processing machine. Other times it is stacked near the entrance to the machine and prolerized as soon as capacity permits. As the scrap emerges from the plant it is either loaded directly into a ship, or, if no ship is waiting at plaintiffs' plant, it is piled on the dock and loaded when a vessel arrives.

On March 4, 1963, and again on March 2, 1964, defendant County of Los Angeles assessed all the steel scrap—processed and unprocessed alike—which was owned by plaintiffs and at the facility. Plaintiffs paid the taxes under protest and later brought this action for their recovery.

Only 79 percent of the scrap assessed is in issue in this proceeding.[2] The parties have stipulated that this 79 percent ". . . had its origin in sales made to Plaintiff by independent or private scrap dealers consisting of auto wreckers, scrap collectors and peddlers who delivered the scrap by truck directly to the loading scales located at the New Dock Street entrance to Plaintiff's terminal island facility. The sale of this 79% of the scrap by these independent or private dealers to Plaintiff takes place at the New Dock Street entrance at Plaintiff's terminal island facility and title to this 79% of the scrap passes from the dealers to Plaintiff at the loading scale at the street entrance to Plaintiff's terminal island facility." Nothing in the record indicates that these deliveries were made pursuant to a pre-existing contract.

Article I, section 10, clause 2 of the United States Constitution in pertinent part provides that: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports. . . ." This

[1] The process is called "prolerizing." It consists of shredding, cleaning, and compressing the scrap steel.

[2] Defendants concede that the other 21 percent of the metal was in the export stream on the tax lien dates.

case requires us to determine whether the scrap assessed to plaintiffs was an "export" within the meaning of the clause.

█ The early case of *Coe* v. *Errol* (1886) 116 U.S. 517, 527 [29 L.Ed. 715, 718, 6 S.Ct. 475], established that property is not immune from state taxation as an export until it has "been shipped or entered with a common carrier for transportation to another State or [has] been started upon such transportation in a continuous route or journey."[3] The purpose of requiring movement or irretrievable commitment to export was to provide certainty that the property would not be diverted for use or sale within the state of its origin. (116 U.S. at p. 528 [29 L.Ed. at p. 719].) In the cases since *Coe* v. *Errol*, however, the tests announced in that decision which were merely meant to insure certainty of eventual export, have hardened into a strict requirement in their own right. It will not suffice that a journey to a foreign land is absolutely certain as of the date the tax is levied. Both certainty and motion—or commitment thereto—are necessary to a finding that goods are exports; further, they must exist concurrently. (*Empresa Siderurgica* v. *County of Merced*, 337 U.S. 154, 157 [93 L.Ed. 1276, 1280, 69 S.Ct. 995]; *Richfield Oil Corp.* v. *State Board of Equalization*, 329 U.S. 69, 82-83 [91 L.Ed. 80, 92-93, 67 S.Ct. 156]; *Hugo Neu Corp.* v. *County of Los Angeles*, 241 Cal.App.2d 703, 709 [50 Cal.Rptr. 916].)

The clearest example is *Empresa Siderurgica* v. *County of Merced, supra*. There the plaintiff, a Columbian corporation, had purchased for export to Columbia and acquired title and possession of a cement plant located in Merced County, California. On the tax lien date 12 percent of the plant had been shipped out of the county and was not involved in the proceedings. The balance consisted of 10 percent which had been dismantled and crated or prepared for shipment, 34 percent which had been dismantled but not so prepared and 44 percent which had not been dismantled. In spite of the fact that, as Justice Frankfurter's dissent points out, the trial court had in effect found that the entire plant consisted of interdependent pieces of machinery, the Supreme Court held that only the 12 percent which had left Merced County was an export. After quoting the test laid down in *Coe* v. *Errol, supra*, the court said: "Under that test it is not enough that there is an intent to export, or a

---

[3]Although *Coe* dealt with the tax immunity of goods in the course of interstate commerce, the standard it set down has been applied in determining whether goods have become exports within the meaning of the export clause of the Constitution. (*Empresa Siderurgica*, v. *County of Merced*, 337 U.S. 154, 156 [93 L.Ed. 1276, 1279, 69 S.Ct. 995]; *Richfield Oil Corp.* v. *State Board of Equalization*, 329 U.S. 69 [91 L.Ed. 80, 67 S.Ct. 156]; *Hugo Neu Corp.* v. *County of Los Angeles*, 241 Cal.App.2d 703, 710 [50 Cal.Rptr. 916]; cf. *Shell Oil Co.* v. *State Board of Equalization*, 64 Cal.2d 713, 722-723 [51 Cal.Rptr. 524, 414 P.2d 820].)

plan which contemplates exportation, or an integrated series of events which will end with it. See *Turpin* v. *Burgess,* 117 U.S. 504; *Cornell* v. *Coyne,* 192 U.S. 418. The tax immunity runs to the process of exportation and the transactions and documents embraced in it. *Fairbank* v. *United States,* 181 U.S. 283; *United States* v. *Hvoslef,* 237 U.S. 1; *Thames & Mersey Ins. Co.* v. *United States,* 237 U.S. 19. Delivery of packages to an exporting carrier for shipment abroad (*Spalding & Bros.* v. *Edwards,* 262 U.S. 66) and the delivery of oil into the hold of the ship furnished by the foreign purchaser to carry the oil abroad (*Richfield Oil Corp.* v. *State Board, supra*) have been held sufficient. It is the entrance of the articles into the export stream that marks the start of the process of exportation. Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. Nothing less will suffice.

"So in this case it is not enough that on the tax date there was a purpose and plan to export this property. Nor is it sufficient that in due course that plan was fully executed. Part of the plant that is taxed was dismantled, but it had not been delivered to any carrier for export or otherwise started on its journey on the tax date. It might still have been diverted into the domestic market. The fact that any such diversion would entail a breach of contract, that a part of the plant had already started on its export journey, that an export license had been obtained and a letter of credit deposited in this country increases the expectation on the tax date that exportation of the entire plant would eventuate. But that prospect, no matter how bright, does not start the process of exportation. On the tax date the movement to foreign shores had neither started nor been committed." (337 U.S. at pp. 156-157 [93 L.Ed. at pp. 1279-1280].)

We can see no essential difference between the facts in *Empresa* and those in this case. There was, of course, substantial certainty that all of the scrap metal assessed to plaintiffs would eventually be appropriated to their contract with the Japanese buyers. The real trouble with plaintiffs' position is the same that had plagued the plaintiff in *Empresa:* on the tax lien date the scrap had not started on a transportation to Japan in a "continuous route or journey." It rested at the very same plant where plaintiffs had acquired it. Although part of the scrap then was put through the processing machine, that "movement" was wholly incidental to a step in the manufacturing process. After the scrap emerged from the processing plant, it again came to rest, waiting for a ship. (*Hugo Neu* v. *County of Los Angeles,* 241 Cal.App. 2d 703, 709 [50 Cal.Rptr. 916].)[4]

---

[4]This earlier case involving one of the present plaintiffs which resulted in a holding that scrap at its facilities on the lien date in March 1962 was taxable, is distinguishable on its facts with respect to the certainty of export, but not as far as the move-

Plaintiffs rely principally on *Von Hamm-Young Co.* v. *San Francisco*, 29 Cal.2d 798 [178 P.2d 745, 171 A.L.R. 274]; and *Texas & N.O.R. Co.* v. *Sabine Tram Co.*, 227 U.S. 111 [57 L.Ed. 442, 33 S.Ct. 229] for the proposition that the continuous movement abroad had begun with the transportation of the raw scrap by plaintiffs' vendors to plaintiffs' plant. We find neither case in point.

*Von Hamm-Young* involved a Hawaiian importer who purchased merchandise in various parts of the continental United States for resale in Hawaii. On the first Monday in March, 1943, a quantity of goods thus purchased was warehoused in San Francisco awaiting cargo space to Hawaii. The importer had purchased the goods in various ways. Ninety percent had been bought outside of San Francisco and had been shipped by rail to that city, consigned to the importer in Honolulu. Ten percent were purchased in San Francisco and reached the warehouses other than by common carrier. The defendant city and county levied a personal property tax on the goods. Because of the war in the Pacific the importer had been required to obtain permits from the Hawaiian government before purchasing any of the goods in question. These permits entitled it to cargo space if and when it became available. Such space was allotted by the War Shipping Administration, but the allotments were issued on a priority basis by the Hawaiian government, the first priority being allotted to food. The Supreme Court held that the levy of the personal property tax violated article 1, section 8 of the United States Constitution, as being a tax on interstate commerce.

The distinction between the facts in the case at bar and the 90 percent of the goods involved in *Von Hamm-Young* which had been shipped to San Francisco by common carrier is too obvious to deserve further comment. What comfort plaintiffs derive from the case must be based on the holding that even the 10 percent of the goods purchased locally in San Francisco were held to have been interstate transit in spite of the fact that they had never left the city. There are, however, two differences between *Von Hamm-Young's* purchases in San Francisco and plaintiffs' purchases at its plant. The first is perhaps rather technical and we merely point it out for what it may be worth: while it is clear from the stipulation in the case at bar that plaintiffs had no interest whatever in the scrap they

ment factor is concerned. In the first *Hugo Neu* case none of the scrap assessed was virtually committed to a particular contract. It is quite clear, however, that the court's holding is based on the absence of movement, as well as on the lack of certainty that the scrap in question was destined for export. The first *Hugo Neu* case is therefore a compelling precedent and the trial court in the case at bar indicated that it would have followed it, had it not felt that the later decision in *Montrose Chemical Corp.* v. *County of Los Angeles*, 243 Cal.App.2d 300 [52 Cal.Rptr. 209], compelled a different result.

purchased until it reached their plant, it is inferrable from the facts in *Von Hamm-Young* as recited by the Supreme Court that even with respect to the 10 percent that the importer purchased in San Francisco, it acquired at least a contractual right to the goods, if not title, before they reached the warehouses. The most important point of difference, however, is that the trial court in *Von Hamm-Young* found that the sole reason for the storage at the warehouses on the lien date was the shortage of shipping space to Hawaii. But for the unusual wartime condition which took effective control of the continuity of movement out of the hands of the importer, the goods would have continued on their interstate transit. In the Supreme Court the break in the transit was likened to other breaks in interstate transit, such as breakdowns in the transportation system, delays to promote the safety or conveyance of the transit, or to await ships,[5] or accumulation of sufficient cargo to load a particular ship, which had, in other cases cited by the court, been held not to remove the immunity of goods otherwise in interstate transit from local taxation. It was something wholly out of the importer's control and contrary to its express desires. "In view of the certainty in the present case that the goods were committed to a movement outside the state and would not be diverted into the channels of local trade, the fact that shipping permits had already been obtained for the goods, *and the impossibility under the wartime emergency regulations of delivering the goods directly to the common carriers that were to transport them to Hawaii,* the movement of the goods from the place of purchase to the warehouses must be considered a movement in interstate commerce just as it would have been had the goods been delivered directly to the common carriers and held under their control until shipped." (29 Cal.2d at p. 807. Italics added.) The special circumstances present in *Von Hamm-Young* obviously are absent here.

In *Texas & N.O.R. Co.* v. *Sabine Tram Co., supra,* 227 U.S. 111, the sole issue was whether the defendant railroad properly demanded and received freight charges applicable to interstate commerce under tariffs filed with the Interstate Commerce Commission, but considerably in excess of charges applicable to intrastate commerce under orders of the Railroad

---

[5]The case cited is *Carson Petroleum Co.* v. *Vial,* 279 U.S. 95 [73 L.Ed. 626, 49 S.Ct. 292], where, unlike in the case at bar, the transit by common carrier had started in Kansas, Oklahoma and Texas. The property in question — oil — was delivered by the carriers into tanks at St. Rose, Louisiana. During that transit the oil belonged to the exporter. It then remained in the tanks until a ship arrived or until a sufficient quantity to make up a cargo had accumulated. The *Carson* case, of course, differs from the one at bar in that the delay in the tanks was an incident to a continuous movement of the oil from other states to destinations abroad, while the "delay" in the instant case was the very start of the journey. Indeed the facts in *Carson* parallel the stipulated facts with respect to the 21 percent of the scrap located at plaintiffs' plant on the lien dates concerning which the defendants raise no issue on appeal.

Commission of Texas. The facts were remarkably similar to those of *Carson Petroleum Co.* v. *Vial, supra,* 279 U.S. 95. Indeed the *Carson* case heavily relies on *Sabine Tram* and we borrow part of its recital of the relevant circumstances: "The exporter purchased the lumber from other mills in Texas with which to supply its sales in part . . . The lumber remained after arrival at the shipping port, in the slips or on the dock, until a ship chartered by the exporter arrived, when the exporter selected the lumber suited for that cargo and shipped it to its destination. There was no local market for lumber at the port of shipment, the population of which did not exceed fifty, and the exporter had never done any local business at that point." (279 U.S. at p. 107 [73 L.Ed. at p. 631].) The Supreme Court held that the railroad properly charged the interstate commerce tariff. The case, however, is not in point because again, as in *Carson,* there was but a temporary interruption of a continuous movement of the lumber by the exporter from points inside the state of Texas to destinations abroad. Long before it ever reached the docks, the lumber had been sold to one who used the dock facilities merely for the purpose of making up cargos for ships as they arrived. In the case at bar any scrap dealer who loaded a truck intending to deliver and sell its contents to plaintiffs at their plant, was perfectly free to turn around at the gate and take his load elsewhere. Plaintiffs had no connection with the scrap until it reached the very plant where it was on the lien dates.

Plaintiffs point out that the Supreme Court, in *Richfield Oil Corp.* v. *State Board of Equalization,* 329 U.S. 69, 82 [91 L.Ed. 80, 92, 67 S.Ct. 156], disavowed any requirement that goods must have been delivered to a common carrier for the purpose of export and held that such delivery was merely evidence that the "process of exportation has started."[6] *Richfield* however did not dispense with the requirement of physical movement into the export stream. It merely held that there are ways other than delivery to a common carrier to start the process of exportation. As defendants point out in their closing brief: "It is not now and never has been appellant's [*sic*] position that for the requirement of a continuous journey to be met there must be delivery to a common carrier. If the facts in this case were otherwise and plaintiff, the exporter, had purchased the 79 percent from the private junk dealers at some other location and then contracted for delivery of the scrap to its harbor facility by these private dealers there is no question that such scrap would have begun a continuous foreign journey."

---

[6] In *Richfield,* oil had been carried by pipeline from Richfield's refinery in California to storage tanks at the harbor. It was then pumped into storage tanks of a vessel owned by the purchaser, the government of New Zealand. The State of California attempted to levy a sales tax against Richfield measured by the gross receipts from the transaction.

We have previously indicated (see fn. 4, *ante*) that the trial court would have found that the scrap in issue here was not an export, were it not for the decision in *Montrose Chemical Corp.* v. *County of Los Angeles,* 243 Cal.App.2d 300 [52 Cal.Rptr. 209]. The facts in *Montrose* were somewhat unique. The goods involved were a product known as "D.D.T. Concentrate" which could not legally be sold in the United States. Plaintiff had contracted with certain purchasers to prepare, package and deliver certain quantities of the product "F.A.S. vessel, Los Angeles, California" for shipment abroad. When orders for D.D.T. Concentrate were received, plaintiff delivered certain raw materials for its manufacture to Stauffer Chemical Company, which then prepared the D.D.T. Concentrate and packaged it in fibre drums specially designed for shipment on ocean vessels. It then remained at the Stauffer plant pending notification from the buyers to deliver it dockside. The taxes involved in *Montrose Chemical* were levied on packaged D.D.T. Concentrate while at the Stauffer plant awaiting instructions. The Court of Appeal held for the taxpayer, quoting from *Hugo Neu Corp.* v. *County of Los Angeles,* 241 Cal.App.2d 703, 708-709 [50 Cal.Rptr. 916] that "if the certainty of a foreign destination is plain, levying a tax is improper even though there is no delivery to a common carrier."[7] It saw such certainty of a foreign destination in the illegality of any sale for domestic consumption and the packaging for ocean transport.

Defendants strongly urge us to disagree with *Montrose Chemical.* They point out that the case appears to ignore the requirement of a continuous route or journey to a destination abroad, since the goods found immune from local taxation were precisely where they had been manufactured. We, however, hesitate to disagree with another division of this court. For present purposes it is sufficient to point to a clear distinction between *Montrose Chemical* and this case: the illegality of any diversion of the D.D.T. Concentrate into the domestic market. It may well be that if such a case reaches the Supreme Court of the United States that court would reach the same result as the court in *Montrose Chemical.*

The judgment is reversed.

Aiso, J., and Reppy, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied June 24, 1970.

---

[7]For that statement, the court in the first *Hugo Neu* case, relied on *Richfield Oil Corp.* v. *State Board of Equalization, supra,* 329 U.S. 69. That case, of course, involved considerable movement of oil ticketed for export, although not by common carrier.