[Civ. No. 27321. First Dist., Div. Two. Apr. 28, 1971.]

RICE GROWERS' ASSOCIATION OF CALIFORNIA,
Plaintiff and Respondent, v.
COUNTY OF YOLO, Defendant and Appellant.

■

**COUNSEL**

Charles R. Mack, County Counsel, and John T. Ketelsen, Deputy County Counsel, for Defendant and Appellant.

Joseph L. Alioto, Stephen J. Schwartz and Peter J. Donnici for Plaintiff and Respondent.

**OPINION**

**DAVID, J.***—The county appeals a judgment, whereby plaintiff association was held entitled to recover general taxes, paid under protests, in the aggregate sum of $89,993.96. The sole issue is whether the rice so taxed was or was not an "export" at the time of taxation. If it was, then the taxation was prohibited by article I, section 10, clause 2, of the United States Constitution. If it was not, the county is entitled to retain the sums collected. ■ Although the trial court purported to make findings of fact, the facts were stipulated and hence none were required. This court is therefore presented with questions of law alone, and makes its own construction of the stipulated facts. (*Chase Brass & Copper Co.* v. *Franchise Tax Bd.* (1970) 10 Cal.App.3d 496, 502 [87 Cal.Rptr. 239], hg. den., cert. den. 400 U.S. 961 [27 L.Ed.2d 381, 91 S.Ct. 365]; *Crawford* v. *Imperial Irrigation Dist.* (1927) 200 Cal. 318, 335 [253 P. 726]; *Export Leaf Tobacco Co.* v. *County of L.A.* (1949) 89 Cal.App.2d 909, 916 [202 P.2d 622].)

The joint stipulation of facts may be summarized as follows: Respondent is a non-profit corporation existing under the laws of this state engaged exclusively in the operation of a rice mill and related facilities with its principal office located in West Sacramento, Yolo County. On March 7, 1966, appellant assessed certain quantities of rice belonging to respondent and levied taxes against respondent accordingly, which respondent paid under protest. All of the rice was grown and processed within the state and was stored and shipped in bulk.

The following six categories of rice were taxed:

(1) Pearl Milled Rice, sold to a wholly owned subsidiary corporation of respondent located in Puerto Rico pursuant to a contract "consummated" prior to the tax date. Prior to the tax date, the rice had been milled and

---

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.

■

processed to the purchaser's exact specifications, transported to the Port of Sacramento and stored in bins belonging to the port authority awaiting ocean transportation in a vessel to be designated by the purchaser. The rice had been milled lighter than Pearl Rice sold by respondent in Hawaii and harder than that sold by respondent in the continental United States. The rice was shipped to Puerto Rico subsequent to the tax date.

(2) Calrose Milled Rice, sold to an Okinawan importer's association pursuant to a contract "consummated" prior to the tax date. Also prior to said date, the rice had been milled and processed to the exact specifications of the purchaser at respondent's mills located at West Sacramento and Biggs, California, transported to the port and stored in bins owned by the port authority awaiting ocean transportation in a vessel to be designated by the purchaser. The rice had not been shipped upon prior delivery to the port because of ship space limitations. Because of its "brokens content," the rice could not be sold in the domestic market without being remilled and graded. The rice was shipped to Okinawa subsequent to the tax date.

(3) Calrose Brown Rice, sold to a Japanese importer's association pursuant to a contract "consummated" prior to the tax date. Also prior to said date, the rice had been milled and processed to the purchaser's exact specifications at respondent's mill at Biggs, transported to the port and stored in bins belonging to the port authority awaiting ocean transportation in a vessel to be designated by the purchaser. The rice was milled only for sale to Japan, and because of its unacceptable edible condition, had no domestic market. The rice was shipped to Japan subsequent to the tax date.

(4) Calrose Brown Rice, sold to the same purchaser and under the same conditions as described in category 3, except that because of insufficient space available at the port, this rice was stored in separate bins in respondent's West Sacramento warehouse (located approximately one mile from the port) awaiting ocean transportation in a vessel to be designated by the purchaser.

(5) Pearl Brown Rice, sold to the same purchaser and under the same conditions as described in category 4, except that a mere generic difference existed between this type of rice and Calrose Brown Rice.

(6) Pearl Paddy Rice, sold to the same purchaser and under the same contract as that in categories 3, 4 and 5; but on the tax date this rice occupied a storage warehouse at respondent's West Sacramento mill and was milled and processed to the purchaser's specifications *subsequent* to the tax date. Respondent needed said rice to meet its contractual obli-

gations. The rice was shipped to Japan with the rice described in category 5 subsequent to the tax date.

Negotiable bills of lading were to be issued by the ocean carrier for all of the categories of rice, and payment was to be made by all purchasers upon delivery of such documents. The terms of all sales were f.o.b. Sacramento. The amount of rice included in each category represented varying proportions of the total rice sold under each of the contracts. The contracts with purchasers in Okinawa and Japan provided for variances of 10 percent of the quantities sold in order to permit ship owners to accommodate the shipments to available ship space.

As a result of milling and processing the rice described in categories 2, 3, 4 and 5, to the purchasers' specifications, that rice could be marketed domestically only if it were remilled, which was economically unfeasible. Respondent would not mill the rice in such categories without prior order, and, had the rice not been exported, would have breached its sale contracts with the purchasers and its subsidy agreement with the United States government.

It was indicated upon the argument of this cause, that the milling of rice is designed to remove the outer bran layers surrounding the kernel, successively; the degree to which this is done, depending upon the market. In the milling process, there is breakage of a certain proportion of the rice kernels. For domestic consumption, these commonly are screened out as undesirable. But for Far Eastern markets, where rice has expanded uses, such as for wine making and brewing, broken kernels are acceptable. The various categories are described in the Agricultural Adjustment Act (7 U.S.C.A. § 1380p, subds. (b) and (c)) and the subsidy which respondent refers to is established by the same act. (7 U.S.C.A. § 1380k.)

The policy effectuated by the import-export clauses of the federal Constitution, and their history, is well known. (*Youngstown Co.* v. *Bowers* (1959) 358 U.S. 534, 545 [3 L.Ed.2d 490, 498, 79 S.Ct. 383]; *Cook* v. *Pennsylvania* (1878) 97 U.S. 566 [24 L.Ed. 1015]; *McGoldrick* v. *Berwind-White Co.* (1940) 309 U.S. 33 [84 L.Ed. 565, 60 S.Ct. 388, 128 A.L.R. 876]; *American Smelting etc. Co.* v. *County of Contra Costa* (1969) 271 Cal.App.2d 437, 455-458 [77 Cal.Rptr. 570], app. dism. 396 U.S. 273 [24 L.Ed.2d 462, 90 S.Ct. 553].) These therefore need not be elaborated upon this appeal.

There is no question that the tremendous expansion in the definition of commerce with foreign nations, among the several states, and with the Indian tribes, has diminished state power as federal controls are estab-

lished. Therefore, taxation for local purposes upon items and incidents of commerce, once thought completely intrastate, have been imperiled in theory, when not in fact. This has led the United States Supreme Court to a process of careful balancing of federal and state interests in the tax field, where interstate commerce may be "affected" if not "burdened."

The present parlous condition of state and local finances is well known, and appellant properly urges that the definition of "export" should not be expanded from its past well-established connotation, so as to further impair the finances of maritime states and local government. The local taxpayer is not compelled to subsidize exports as a matter of policy. (*American Smelting etc. Co.* v. *County of Contra Costa, supra,* 271 Cal. App.2d at p. 459.) Fortunately, we are not called upon to address ourselves to the problem before us as a matter of policy, since the United States Supreme Court adheres to the long-accepted definition of "export."

## I

We have concluded that all of the rice in question was properly assessed and taxed: "It will not suffice that a journey to a foreign land is absolutely certain as of the date the tax is levied. Both certainty and motion—or commitment thereto—are necessary to a finding that goods are exports; further, they must exist concurrently." (*Hugo Neu Corp.* v. *County of Los Angeles* (1970) 7 Cal.App.3d 21, 24 [86 Cal.Rptr. 332], hg. den.) The recent analysis made by the court in the case last cited, and its consideration of the United States and California cases parallels our own conclusions, and to that extent need not be reexamined.

Most of the contentions of the taxpayer are answered by the leading case of *Empresa Siderurgica* v. *Merced Co.* (1949) 337 U.S. 154, 156 [93 L.Ed. 1276, 1279, 69 S.Ct. 995]. It held: (1) it is not enough that on the tax date there is a purpose and plan to export the property; (2) it is not sufficient that in due course, the plan was executed; (3) it is not sufficient that on that date, that goods were prepared for export, but had not been delivered to any carrier for export, nor started on its journey out of the country; (4) so long as the owner maintains physical control of the goods, it does not matter that any diversion of them to another market would occasion a breach of contract; (5) it is immaterial that an export license has been obtained, or that a letter of credit to pay for the goods is available. Like the other factors, these increase the expectation at the tax date that the export would eventuate. "But that prospect, no matter how bright, does not start the process of exportation. On the tax date the movement

to foreign shores had neither started nor been committed." "Nothing less will suffice." (337 U.S. at p. 157 [93 L.Ed. at p. 1280].)

In *Cornell* v. *Coyne* (1904) 192 U.S. 418, 427 [48 L.Ed. 504, 507, 24 S.Ct. 383], it is held: "The true construction of the constitutional provision is that no burden by way of tax or duty can be cast upon the-exportation of articles, and does not mean that articles exported are relieved from the ordinary prior burdens of taxation which rest upon all property similarly situated. The exemption attaches to the export and not to the article before its exportation." This was quoted with approval in *Peck & Co.* v. *Lowe* (1918) 247 U.S. 165, 174 [62 L.Ed. 1049, 1051, 38 S.Ct. 432].

At the outset, it is clear that in view of these cases, and those hereinafter discussed, the decision in *Montrose Chemical Corp.* v. *County of Los Angeles* (1966) 243 Cal.App.2d 300 [52 Cal.Rptr. 209] (cert. den. 386 U.S. 1004 [18 L.Ed.2d 432, 87 S.Ct. 1346]) cannot be reconciled, except perhaps as valiantly attempted in *Hugo Neu Corp.* v. *County of Los Angeles, supra,* 7 Cal.App.3d 21, 24. However enigmatic the denial of certiorari therein, there is no uncertainty in the rules pronounced and applied by the United States Supreme Court and our own. The situation is akin to that authoritatively disposed of in *Western L. Co.* v. *State Bd. of Equalization* (1938) 11 Cal.2d 156, 167-168 [78 P.2d 731, 117 A.L.R. 838].

An intention to export does not bar general ad valorem taxation; carriage to the export depot does not, since the goods must enter on their final journey to be "exports." While stopped for an indefinite time, or awaiting transportation, or awaiting sale at the point of destination, or at an intermediate point, the goods are subject to general ad valorem taxation. (*Diamond Match Co.* v. *Ontonagon* (1903) 188 U.S. 82, 95-96 [47 L.Ed. 394, 399, 23 S.Ct. 266].) ▪ Exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to the mass of things belonging to some foreign country or other. (*Swan & Finch Co.* v. *United States* (1903) 190 U.S. 143, 145 [47 L.Ed. 984, 986, 23 S.Ct. 702].)

The *Empresa* case was subsequent to the California case of *Richfield Oil Corp.* v. *State Board* (1946) 329 U.S. 69 [91 L.Ed. 80, 67 S.Ct. 156]. It is quite clear, contrary to respondent's contentions, that this case did not abandon the established requirement of movement out of the country, substituting a test of "certainty of export," in defining *exports.* In the *Richfield* case, the oil at dockside was not delivered to a *common carrier* for transportation to a foreign country. Previously this had been stated to be the test of what was an export. Here, delivery by Richfield was directly to

the consignee, the government of New Zealand, into its own ship. The court stated (at p. 82 [91 L.Ed. at pp. 92-93]): "The certainty that the goods are headed to sea and that the process of exportation has started may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose. But the same degree of certainty may exist though no common carrier is involved. The present case is an excellent illustration. The foreign purchaser furnished the ship to carry the oil abroad. Delivery was made into the hold of the vessel from the vendor's tanks located at the dock. *That delivery marked the commencement of the movement of the oil abroad. . . .* The *means of shipment* are unimportant so long as the certainty of the foreign destination is plain." (Italics supplied.)

In *Sugarman* v. *State Board of Equalization* (1958) 51 Cal.2d 361, 367 [333 P.2d 333], it is stated that the critical point in the *Richfield Oil* case is that at the time of the sale, the goods were committed to the channels of export (i.e., loaded into the customer's ship) but followed by recognizing, "All goods destined for export are not, however, exempt from state taxation." (*Joy Oil Co.* v. *State Tax Comm'n* (1949) 337 U.S. 286 [93 L.Ed. 1366, 69 S.Ct. 1075] (ad valorem property tax); *Empresa Siderurgica* v. *Merced Co., supra,* 337 U.S. 154 (personal property tax).)

The process of export begins when goods are committed to the common carrier for transportation out of the country to a foreign destination. (*Shell Oil Co.* v. *State Bd. of Equal.* (1966) 64 Cal.2d 713, 720-721 [51 Cal.Rptr. 524, 414 P.2d 820], app. dism. 386 U.S. 211 [17 L.Ed.2d 870, 87 S.Ct. 973].) The court therein (at p. 721) stated that a broad interpretation, leading back to every product, process or service somehow related to and necessary for exportation, has not been accepted.

In a sales tax case, *Gough Industries* v. *State Board of Equal.* (1959) 51 Cal.2d 746 [336 P.2d 161] (cert. den. 359 U.S. 1011 [3 L.Ed.2d 1037, 79 S.Ct. 1151]), seven years previously, the court invalidated a sales tax levy, there being a finding by the trial court that the export journey had started when goods left plaintiff's plant, not interrupted by delay for packing; title passing (apparently) upon delivery to the packer. The court did state (at p. 749), "it appears that where an article is manufactured and sold in one of the states for export to a foreign country, it is free from state sales tax under the import-export clause of the United States Constitution if at the time title passed the certainty of the foreign destination was plain."[1] Of course, this statement must be read in context with

---

[1]Standing alone, this statement is contrary to the *Empresa* case and *Canton R. Co.* v. *Rogan* (1951) *infra,* 340 U.S. 511, 515 [95 L.Ed. 488, 493, 71 S.Ct. 447].

the other facts of the case. If there is any implication that manufacture and sale for export alone render the item immune before the export process begins, the California Supreme Court recognized this was not so in the *Shell Oil Co.* case, *supra,* such broad interpretation not being imposed or accepted by the United States Supreme Court.[2]

In the case before us, title had not passed, and would not pass until the ships were loaded and the carrier's bills of lading were delivered to the respondent, which then became the basis of payment. The situation was comparable to that involved as to oil in *Richfield Oil Corp.* v. *State Board, supra,* 329 U.S. 69. The rice became an "export" when it was loaded into the ship carrying it to the foreign country.

■ Finally, appellant contends that category 1 rice shipped to Puerto Rico did not constitute an export because Puerto Rico is not a "foreign country," but rather a " 'state' or 'territory.' "

The same considerations applicable to the other categories apply. In addition, we agree that Puerto Rico is not a foreign country but a commonwealth of the United States.

Pursuant to the congressional statute (48 U.S.C.A. §§ 731b-731e), the Puerto Rico Instrument of Government or Constitution was adopted by the electorate in 1952, and approved by the Congress. As a commonwealth, Puerto Rico appears to have greater autonomy than a territory, but nominally it is short of statehood. (*Secretary of Agri.* v. *Cent. Roig Co.* (1950) 338 U.S. 604, 619 [94 L.Ed. 381, 392, 70 S.Ct. 403].) It is subject to all statutes of the United States, not locally inapplicable. (48 U.S.C.A. § 734.) It is territory of the United States, and under United States Constitution, article IV, section 3, the Congress has power "to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." (Cf. *Americana of Puerto Rico, Inc.* v. *Kaplus* (3d Cir. 1966) 368 F.2d 431, cert. den. 386 U.S. 943 [17 L.Ed.2d 874, 87 S.Ct. 977].) Frequently, throughout the statutes, Puerto Rico is included specifically within the definitions of the United States. One of these is in the Agricultural Adjustment Act, relative

---

The court in *Gough Industries* made no reference to the latter case, and distinguished *Empresa* (at p. 750) on the ground carriage there had not commenced. It therefore is clear that this was the basis of the decision, and not the idea that mere commitment to a foreign contract gives the immunity.

[2]The last case cited states the rule (p. 718) "Under the import-export clause, a state may not impose a tax against an article of export *if the article has commenced its movement abroad and the 'certainty of the foreign destination is plain.' "* The requirement is dual. Mere certainty does not suffice. (*Hugo Neu Corp.* v. *County of Los Angeles, supra,* 7 Cal.App.3d 21, 24.)

to rice. (7 U.S.C.A. § 1380p, subd. (d).) Examples are given in the *Americana* case, *supra.* The U.S. Code, General Index, supplement V, page 4777, lists 42 acts wherein "state" means or includes Puerto Rico, but the total index of applicable acts takes four pages. In the Hazardous Substances Act (15 U.S.C.A. § 1261) the word "territory" is defined to include Puerto Rico.

In *Porto Rico Brokerage Co., Inc.* v. *United States* (1935) 76 F.2d 605, 610 [23 Cust. & Pat. App. (Cust.) 16] (cert. den. 298 U.S. 671 [80 L.Ed. 1394, 56 S.Ct. 936]), it was held that products of the United States coming into Puerto Rico were not "imports." Since "import" and "export" are correlative terms, goods leaving the United States for Puerto Rico are not "exports" (*id.,* p. 609) since not destined for a foreign country, which Puerto Rico ceased to be upon ratification of the treaty with Spain. (*Id.,* p. 610.) Though relating to "imports," *Dant & Russell* v. *Board of Supervisors* (1943) 21 Cal.2d 534 [133 P.2d 817] is germane to the question, as is the dicta of *Dooley* v. *United States* (1901) 183 U.S. 151, 154-155 [46 L.Ed. 128, 130, 22 S.Ct. 62]. Since the Philippine Islands now are independent, and Puerto Rico is a commonwealth of the United States, the considerations advanced by a highly divided court relative to "imports" from the former in *Hooven & Allison Co.* v. *Evatt* (1945) 324 U.S. 652, 671 [89 L.Ed. 1252, 1266, 65 S.Ct. 870], not since repeated, are not deemed applicable to the issue before us.

## II

To summarize: The cases establish:

(1) The intention to export is not enough. (*Diamond Match Co.* v. *Ontonagon, supra,* 188 U.S. 82, 95-96 [47 L.Ed. 394, 399-400]; *Joy Oil Co.* v. *State Tax Comm'n, supra,* 337 U.S. 286; *Empresa Siderurgica* v. *Merced Co., supra,* 337 U.S. 154; *Sugarman* v. *State Board of Equalization, supra,* 51 Cal.2d 361.)

(2) Manufacturing goods or processing to fill an export order, even to consignee's specifications, does not constitute the goods an export, before the final uninterrupted journey commences. (*Spalding & Bros.* v. *Edwards* (1923) 262 U.S. 66, 69 [67 L.Ed. 865, 867, 43 S.Ct. 485]; *Peck & Co.* v. *Lowe, supra,* 247 U.S. 165, 174-175 [62 L.Ed. 1049, 1051-1052]; *Canton R. Co.* v. *Rogan, supra,* 340 U.S. 511; *Empresa Siderurgica* v. *Merced Co., supra,* 337 U.S. 154; *U.S.* v. *E. C. Knight Co.,* 156 U.S. 1, 12 [39 L.Ed. 325, 329, 15 S.Ct. 249]; *Cornell* v. *Coyne, supra,* 192 U.S. 418, 429 [48 L.Ed. 504, 508]; *Oliver Iron Co.* v. *Lord* (1923) 262 U.S.

172, 178 [67 L.Ed. 929, 935, 43 S.Ct. 526]; cf. *Utah Power & L. Co.* v. *Pfost* (1932) 286 U.S. 165, 181 [76 L.Ed. 1038, 1046, 52 S.Ct. 548].)

A comparable case, involving interstate commerce, is *Federal Compress Co.* v. *McLean* (1934) 291 U.S. 17, wherein it is stated at page 21 [78 L.Ed. 622, 626, 54 S.Ct. 267]: "Most articles, before their shipment in interstate commerce, have had work done upon them which adapts them to the needs of commerce and prepares them for safe and convenient transportation, but that fact has never been thought to immunize from local taxation either the articles themselves or those who have manufactured or otherwise prepared them for interstate transportation." (Citing cases.) Where movement is halted, to process goods for the seller's profit, the property is subject to tax. (*Bacon* v. *Illinois* (1913) 227 U.S. 504, 515-517 [57 L.Ed. 615, 620, 33 S.Ct. 299]; *American Smelting etc. Co.* v. *County of Contra Costa, supra,* 271 Cal.App.2d 437, 453; *Diamond Match Co.* v. *Ontonagon, supra,* 188 U.S. 82, 95 [47 L.Ed. 394, 399].)

(3)   It is not within the power of the shipper or consignee by contract to convert the character of goods to that of an export, before carriage out of the country commences. (Cf. *Federal Compress Co.* v. *McLean, supra,* 291 U.S. 17; *Heisler* v. *Thomas Colliery Co.* (1922) 260 U.S. 245, 259 [67 L.Ed. 237, 243, 43 S.Ct. 83].) The existence of such a consummated contract for export of goods is not enough. (*Empresa Siderurgica* v. *Merced Co., supra,* 337 U.S. 154; cf. *Oliver Iron Co.* v. *Lord, supra,* 262 U.S. 172, 178.)

(4)   The fact that goods could not be diverted to other purchases or uses without a breach of contract is a factor increasing the certainty of export, but does not make the goods "exports," before the journey out of the country commences. (*Empresa Siderurgica* v. *Merced Co., supra,* 337 U.S. 154.)

(5)   Certainty of transport to a foreign destination does not create the status of "export" nor exemption from local taxation. (*Sugarman* v. *State Board of Equalization, supra,* 51 Cal.2d 361; as to interstate commerce, *Heisler* v. *Thomas Colliery Co., supra,* 260 U.S. 245, 259; contra: *Montrose Chemical Corp.* v. *County of Los Angeles, supra,* 243 Cal.App.2d 300, 303.)

(6) Passage of title is not a determining factor of itself. In this case, title to the rice had not passed, and was not to pass, nor was respondent to be. paid, until the rice was received by the ships and bills of lading issued, upon which payment would be made upon delivery to the pur-

chasers. Cases claimed to establish that certainty of exportation alone when title passes makes an item an export do not support that contention. In *Gough Industries* v. *State Board of Equal., supra,* 51 Cal.2d 746, the goods were held to have started their ultimate journey upon delivery to the packer, at which time title passed. (Cf. a comparable case: *So. Pac. Terminal Co.* v. *Int. Comm. Comm.* (1911) 219 U.S. 498, 527 [55 L.Ed. 310, 320, 31 S.Ct. 279].) In *Richfield Oil Corp.* v. *State Board, supra,* 329 U.S. 69, the sale occurred and title passed, when the oil was pumped into the awaiting vessel.

■ (7) Carriage of rice by the respondent to the port storage, as the export depot, does not make the commodity an "export." (*Diamond Match Co.* v. *Ontonagon, supra,* 188 U.S. 82, 95 [47 L.Ed. 394, 399]. Cf. *Coe* v. *Errol* (1886) 116 U.S. 517, 525, 528 [29 L.Ed. 715, 718, 719, 6 S.Ct. 475]; *Bacon* v. *Illinois, supra,* 227 U.S. 504, 514-516 [57 L.Ed. 615, 619-620]; *Shell Oil Co.* v. *State Bd. of Equal., supra,* 64 Cal.2d 713, 722; cf. *Federal Compress Co.* v. *McLean, supra,* 291 U.S. 17, 19-20 [78 L.Ed. 622, 625].) It must start on its *ultimate* passage. (Cases above cited; *McCluskey* v. *Marysville & North'n Ry. Co.* (1917) 243 U.S. 36, 40 [61 L.Ed. 578, 580, 37 S.Ct. 374].)

(8) Handling of the rice at the port, short of loading it on the boat to carry it to its foreign destination, does not make the rice "exports" (*Canton R. Co.* v. *Rogan, supra,* 340 U.S. 511; *General Oil Co.* v. *Crain* (1908) 209 U.S. 211, 231 [52 L.Ed. 754, 765, 28 S.Ct. 475]) even though the lots were segregated and labeled.

(9) Goods do not become "exports" by the mere fact of leaving the country. Hence, oil delivered to a ship for use as bunker fuel on its voyage is not an export. Because the ship flies a foreign flag does not make it a foreign country, under the export definition. (*Shell Oil Co.* v. *State Bd. of Equal., supra,* 64 Cal.2d 713, 719-720, and cases cited.)

The rice had not reached the status of export by reason of storage at the port. The respondents still had title and control until bills of lading were issued by the carriers upon loading the ship and delivered to the purchasers. (Cf. *Minnesota* v. *Blasius* (1933) 290 U.S. 1, 11-12 [78 L.Ed. 131, 136-137, 54 S.Ct. 34].)

(10) Licensing the export under applicable federal acts does not withdraw the respondent's rice from the nondiscriminatory ad valorem tax. (Cf. *Federal Compress Co.* v. *McLean, supra,* 291 U.S. 17, 19 [78 L.Ed. 622, 625].)

(11) Freedom of transportation regulated under the commercial powers of Congress is not impaired by ordinary taxes upon the value of the property. (*Gloucester Ferry Co.* v. *Pennsylvania* (1884) 114 U.S. 196, 217 [29 L.Ed. 158, 166, 5 S.Ct. 826].)

There are certain parallels in the instant case with the facts found in *General Oil Company* v. *Crain, supra,* 209 U.S. 211, 231 [52 L.Ed. 754, 765] (speaking of oil on the dock): "It was only there for distribution, it is said, to fulfill orders already received. But to do this, required that the property be given a locality in the State beyond a mere halting in its transportation. It required storage there—the maintenance of the means of storage, of putting it in and taking it from storage. . . .

"This certainly describes a business—describes a purpose for which the oil is taken from transportation, brought to rest in the State and for which the protection of the State is necessary, a purpose outside of the mere transportation of the oil."

Respondent contends that when commodities can only be used abroad, and can serve no domestic purpose, such goods are irretrievably "committed to export," and hence, even before transportation, are exempt from ad valorem taxation.

No doubt there are many products, some natural, some processed or even manufactured, that would be idle in domestic stocks, for want of local customers. By the stipulations in this case, we are led to believe that when whole rice of varying kinds and grades is available, local consumers impose no demands for broken rice, culled out in the grading and milling process; nor yet perhaps for some grades, or the milling residues. Foreign markets are sought for lower grades of many things; and likewise, for surfeits of commodities which glut the domestic market. For many years, Californians have worn out and smashed up so many automobiles that metal scrap accumulates; and the surplus over domestic demands has, like the rice here, been shipped to Japan. We sense no appreciable difference between this case, and *Hugo Neu Corp.* v. *County of Los Angeles, supra,* 7 Cal.App.3d 21, involving such scrap metal. The only difference in that case seems to be, that orders were filled from scrap on the dock, whereas here, the orders were antecedent. The fact that such orders, or contracts "were consummated" before the tax lien date must be held immaterial, since all of the property in the *Empresa* case, *supra,* was subject to the prior contract; and even the fact that a portion of the property had been shipped, pursuant to the contract, was held not to give the remainder the character of "export," on the theory that the cement plant concerned constituted a "unit for use"; and that by shipment of a portion of the

machinery, there was an irretrievable commitment, which of a certainty, branded all of the machinery as an export, without physical commencement of the movement from the country.

## III

The rules announced by the United States Supreme Court and our own have immense practical validity. As of the first Monday in March, the assessor is required to levy his assessment. This cannot feasibly depend upon the intention of the grower or processor as to the property nor the contracts in relation to it. It would thwart all taxation effectively, if assessment required in each instance that the assessor review, analyze and interpret and give legal effect to contracts of the parties. (Cf. *Trabue Pittman Corp.* v. *County of L.A.* (1946) 29 Cal.2d 385, 392, 397 [175 P.2d 512].)

The ad valorem taxation here concerned was not a tax on the fungible goods as exports, nor on the privilege of exportation. Thus in *Turpin* v. *Burgess* (1886) 117 U.S. 504, 507 [29 L.Ed. 988, 989, 6 S.Ct. 835], it is said: "But a general tax, laid on all property alike, and not levied on goods in course of exportation . . . is not within the constitutional prohibition. How can the officers of the United States, or of the State, know that goods apparently part of the general mass, and not in course of exportation, will ever be exported? Will the mere word of the owner that they are intended for exportation make them exports? This cannot for the moment be contended. It would not be true, and would lead to the greatest frauds."

## IV

In *Canton R. Co.* v. *Rogan, supra,* 340 U.S. 511, 515 [95 L.Ed. 488, 493], Mr. Justice Douglas again stated for the court: "To export means to carry or send abroad; to import means to bring into the country. *Those acts begin and end at water's edge.* [Italics added.] The broader definition which appellant tenders distorts the ordinary meaning of the terms. It would lead back to every forest, mine, and factory in the land and create a zone of tax immunity never before imagined. For if the handling of the goods at the port were part of the export process, so would hauling them to or from distant points or perhaps mining them or manufacturing them. The phase of the process would make no difference so long as the goods were in fact committed to export or had arrived as imports. . . .

". . . Hence we need not decide whether loading for export and unloading for import are immune from tax by reason of the Import-Export Clause. Cf. *Joseph* v. *Carter & Weekes Co.,* 330 U.S. 422.

"We do conclude, however, that any activity more remote than that does not commence the movement of the commodities abroad nor end their arrival and therefore is not a part of the export or import process."

The judgment is reversed, with directions to enter judgment for appellant county, with costs.

Shoemaker, P. J., and Taylor, J., concurred.

Respondent's petition for a hearing by the Supreme Court was denied June 23, 1971.