[Civ. No. 36104. First Dist., Div. Four. Mar. 9, 1976.]

SCHNITZER STEEL PRODUCTS OF CALIFORNIA, INC.,
Plaintiff and Appellant, v.
COUNTY OF ALAMEDA, Defendant and Respondent.

106

**COUNSEL**

Graham & James and Paul A. Dezurick for Plaintiff and Appellant.

Richard J. Moore, County Counsel, and Joseph P. Bingaman, Deputy County Counsel, for Defendant and Respondent.

**OPINION**

**CALDECOTT, P. J.**—The sole issue on this appeal is whether certain scrap metal was an "export" on the lien date in each year in question and therefore exempt from local taxation. We conclude that it was not.

Appellant Schnitzer Steel Products of California, Inc., engaged primarily in buying, processing and selling scrap metal. The metal is purchased in unprocessed form from scrap vendors and peddlers at appellant's facility in Oakland, and processed there to be sold in foreign and domestic commerce. Scrap which has been processed is stored in large open piles pending shipment to purchasers. Separate and distinct piles of processed scrap are maintained for domestic sale and foreign sale. The Oakland facility includes a berth and equipment to load ships docked at the berth.

On March 1, in each of the years 1968, 1969, 1970 and 1971, appellant was the owner of certain processed scrap metal located at the Oakland facility. At all times in question, the scrap rested in the same pile upon which it had been placed following the processing procedure at the facility.

Appellant had entered into general contracts for sale of scrap with three foreign buyers, covering a period of years. However, none of the scrap in question was committed to a specific contract of sale on the lien dates involved, nor was any specific purchaser of the scrap ascertainable at those times. Neither the ship nor the owner of the ship upon which the scrap was to be transported was ascertainable on the lien dates. All of the scrap metal in question, on each respective lien date, was owned, possessed and controlled by appellant.

**108**

On March 1, 1968, March 1, 1969 and March 2, 1970, appellant and Lasco Shipping Company (hereinafter Lasco) executed agreements for the future transportation of the scrap in question on the first available vessels of the Pacific Coast Shipping Company (hereinafter Pacific) or vessels under charter to Lasco.[1] Arrangements had been made prior to these dates in each year, but the documentation was executed only on the dates noted. Lasco on those dates, also executed dock receipts for the scrap. On February 21, 1971, appellant entered into an agreement with Lasco, as agent for Pacific and for itself as charters, for transportation of scrap metal on the first available vessels of Pacific, or its subsidiaries, or vessels under charter to Lasco. Mr. Gary Schnitzer, general manager of appellant, and California agent for Lasco, executed this agreement on behalf of appellant and Lasco. On February 26, 1971, Gary Schnitzer, again acting as Lasco's agent, issued a dock receipt for certain scrap.

On March 3, 1971, the county assessor levied an escape assessment on appellant for fiscal years 1968-1969, 1969-1970, and 1970-1971, covering scrap metal intended for export. On or about July 1, 1971, the assessor levied an assessment for fiscal year 1971-1972, covering scrap metal intended for export. Appellant paid the taxes, and its claim for refund was denied.

The parties stipulated that all of the scrap in question was delivered to foreign mills following the lien dates. However, the court also found that there was a domestic market for a portion of the scrap in the pile intended for foreign sale.

Article I, section 10, clause 2 of the United States Constitution provides: "No State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its Inspection Laws; . . ." No question of inspection laws is involved herein. ■ The sole issue is whether the scrap was an "export" and therefore protected by constitutional prohibition. The precise question presented is whether property originating within this state, unmoved from the place at the owner's facility where it has been stored since manufacture, and under the possession and control of the owner, has entered the "process of exportation" by virtue of agreements with a common carrier for future shipment and dock receipts issued for the property by that carrier.

[1] Appellant is a wholly owned subsidiary of Schnitzer Steel Products of Oregon, the stock of which is owned by the Schnitzer family. The Schnitzer family also owns Lasco Shipping Company and Pacific Coast Shipping Company.

■ The point at which goods enter into the stream of exportation has recently been considered by our Supreme Court. In *Farmers' Rice Cooperative* v. *County of Yolo,* 14 Cal.3d 616 [122 Cal.Rptr. 65, 536 P.2d 465], the court set forth the following general principles applicable to the instant case: "[O]nce goods are actually in the process of exportation, that is have become 'exports,' their immunity from state taxation is absolute.

"However, although goods which are the products of a state may be intended for exportation, until they become 'exports' within the meaning of the constitutional provision, such goods do not cease to be part of the general mass of property in the state and as such within its jurisdiction and subject to taxation in the usual way. [Citations.] ■ 'The Export-Import Clause was meant to confer immunity from local taxation upon property being exported, not to relieve property eventually to be exported from its share of the cost of local services.' [Citations.]

" . . . . . . . . . . . . . . . . . .

■ "The uniform test whether goods have entered the 'stream of interstate commerce' or the 'process of exportation' was early stated by the United States Supreme Court in *Coe* v. *Errol, supra,* 116 U.S. 517, 527 [29 L.Ed. 715, 719, 6 S.Ct. 475], as follows: '[G]oods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until [1] *they have been shipped, or entered with a common carrier for transportation to another State [or country] or [2] have been started upon such transportation in a continuous route or journey.*' (Italics added.)

"The rule of *Coe* v. *Errol* remains the law today." (14 Cal.3d at pp. 620, 622; *Kosydar* v. *National Cash Register Co.,* 417 U.S. 62, 67 [40 L.Ed.2d 660, 665, 94 S.Ct. 2108]; *Empresa Siderurgica* v. *Merced Co.,* 337 U.S. 154 [93 L.Ed. 1276, 69 S.Ct. 995].)

■ Appellant bases its contentions on the proposition that the scrap had been "entered with a common carrier" on the lien dates in question, and that this was proved by the general contracts for sale, the shipping arrangements, and the contracts and dock receipts "formalizing" prior transportation agreements.

The dock receipts acknowledge receipt of the scrap by Lasco, to be shipped "per first available vessels of Pacific Coast Shipping Co. [2] or vessels under charter to Lasco Shipping Co." Appellant urges that the documents prove that the goods had been received by Lasco, and terms of carriage had been agreed to, prior to lien date each year. This, appellant contends, constitutes entry and commitment with a carrier sufficient to fall within the stream of export decisions.

■ As summarized in *Rice Growers' Association of California* v. *County of Yolo,* 17 Cal.App.3d 227, 237-240 [94 Cal.Rptr. 847], cited with approval in *Farmers' Rice Cooperative, supra*: "(1) The intention to export is not enough. [Citations.] [¶] (2) Manufacturing goods or processing to fill an export order, even to consignee's specifications, does not constitute the goods an export, before the final uninterrupted journey commences. [Citations.] . ... [¶] (5) Certainty of transport to a foreign destination does not create the status of 'export' nor exemption from local taxation. [Citations.]" Further, actual subsequent export is not determinative of taxability as of the tax lien date. *(Joy Oil Co.* v. *State Tax Comm'n.,* 337 U.S. 286 [93 L.Ed. 1366, 69 S.Ct. 1075].)

More significantly, "It is not within the power of the shipper or consignee by contract to convert the character of goods to that of an export, before carriage out of the country commences." *(Rice Growers' Association, supra,* 17 Cal.App.3d at p. 238.) This principle is derived from *Federal Compress Co.* v. *McLean,* 291 U.S. 17, 22 [78 L.Ed. 622, 627, 54 S.Ct. 267], where it is said that, "[t]he fact that appellant's contract with the interstate rail carrier has designated appellant as the carrier's agent and appellant's warehouse as the carrier's depot cannot alter the legal consequences of what is actually done with the cotton by its owners or of their power of control over it, or of the actual course of dealing with it by appellant. It is not within the power of the parties, by the descriptive terms of their contract, to convert a local business into an interstate commerce business . . . ."

■ The dock receipt itself raises only a rebuttable presumption of delivery to Lasco; the rule, stated in cases not involving export questions, is that "the giving of such documents is important evidence that the custody of the goods has been taken by the carrier, [but] it is neither essential nor conclusive." *(Mackey* v. *United States,* 197 F.2d 241, 243; *Strohmeyer & Arpe Co.* v. *American Line S.S. Corp.,* 97 F.2d 360, 361-362; *McAllister Lighterage Line, Inc.* v. *S/S Steel Age,* 306 F.Supp.

[2]Pacific Coast Shipping Co. is not a common carrier.

19, 26, quoting *Inland Waterways Corp.* v. *Standard Commercial Co.,* 65 F.2d 715, 717.) In the instant case, the trial court found that on the lien dates the scrap metal was owned, possessed, and controlled by appellant. The court implicitly found that in fact no delivery had been made to the carrier by the lien dates each year, in spite of the exchange of documents.

Nor did the existence of contracts for future transportation constitute "entry" into the stream of exportation.[3] ■ "Certainty of export evidenced by financial and contractual relationships does not by itself render goods 'exports' before the commencement of their journey abroad." (*Sumitomo Forest Co., Ltd. of Japan* v. *Thurston City, Wash.,* 504 F.2d 604, 608.)

"The process of exportation does not begin 'until the article at issue begins its *physical entry* into the stream of exportation.' (Italics added.) There is such a 'physical entry' when the goods have been delivered on shipboard for their delivery abroad, or have been delivered to a common carrier for such foreign transportation 'in a continuous route or journey.'" (*Farmers' Rice Cooperative, supra,* 14 Cal.3d at p. 625, quoting *Kosydar, supra,* 417 U.S. 62.) Even the principal case relied upon by appellants, *Spalding & Bros.* v. *Edwards,* stated that it turned on the "*overt act of delivering the goods* to the carrier." (262 U.S. 66, 70 [67 L.Ed. 865, 868, 43 S.Ct. 485]; italics added.)

■ In the instant case, regardless of the documentary formalities, there was no delivery to or entry with the carrier. The scrap metal, remaining in the original piles at appellant's facility and in its complete possession and control, had not begun its movement or physical journey. It was not an export on the lien dates involved (cf. *Hugo Neu Corp.* v. *County of Los Angeles,* 7 Cal.App.3d 21 [86 Cal.Rptr. 332]), and was therefore properly taxed by the respondent.

The judgment is affirmed.

Christian, J., and Emerson, J.,* concurred.

---

[3]We recognize that there are ways other than delivery to or entry with a common carrier to start the process of exportation. (*Richfield Oil Corp.* v. *State Board,* 329 U.S. 69 [91 L.Ed. 80, 67 S.Ct. 156].) However, none of these alternatives are raised under the facts of the instant case, nor does appellant so contend.

*Retired judge of the superior court sitting under assignment by the Chairman of the Judicial Council.