**SUMITOMO FORESTRY CO., LTD. OF JAPAN, Plaintiff-Appellee,**

**v.**

**THURSTON COUNTY, WASHINGTON, a legal subdivision of the State of Washington, Defendant-Appellant.**

**No. 72-2395.**

United States Court of Appeals, Ninth Circuit.

Oct. 8, 1974.

---

William L. Britton, Deputy Pros. Atty., Olympia, Wash., for defendant-appellant.

Thomas G. Holcomb, Seattle, Wash., for plaintiff-appellee.

Before HUFSTEDLER and WRIGHT, Circuit Judges, and WILLIAMS,* District Judge.

## OPINION

EUGENE A. WRIGHT, Circuit Judge:

In this case we must decide whether Thurston County, Washington, may impose an *ad valorem* tax on logs stored at the Port of Olympia awaiting ships for transportation to Japan. The district court held that the logs were in the process of exportation and that the tax was, therefore, a state imposed duty on exports prohibited by Article I, Section 10, Clause 2, of the United States Constitution.[1] Following submission of the ap-

---

* Of the Northern District of California.

1. No state shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely necessary for executing its inspection Laws . . . .

peal, we vacated our action pending the Supreme Court's disposition of Kosydar v. National Cash Register Co., 417 U.S. 62, 94 S.Ct. 2108, 40 L.Ed.2d 660 (1974). After the opinion therein was filed, we vacated the judgment of the district court and remanded for reconsideration in light of the decision in *Kosydar*. The district court concluded that *Kosydar* did not affect its earlier disposition. We disagree, and reverse with directions to the district court to enter judgment in favor of appellant Thurston County.

The parties submitted the case on stipulated facts. Sumitomo is a foreign corporation which imports logs to Japan. Each summer it takes orders from its Japanese customers and buys logs to meet demand.[2] The logs in issue were purchased in Washington state and delivered to Sumitomo f. o. b. the Port of Olympia. The seller performed all sorting, scaling, loading, and unloading of the logs except they were not sorted by length at delivery. The logs were then stored in a storage yard at the port awaiting ships to take them to Japan.

In order to load ships efficiently as they arrived at the port, Sumitomo continuously had a supply of logs on hand in the storage area. The average turnover was 45 days, although specific logs may have stayed in the storage area for a shorter or longer period of time. All logs were stored only as long as necessary to await arrival of a ship upon which they could be loaded. Sumitomo sold no logs domestically, and the financial arrangements, the company's past practices, and the type of logs purchased indicated with reasonable certainty that the logs would be exported.

The issue on appeal is whether the county may levy an *ad valorem* tax on logs stored by Sumitomo at the Port of Olympia awaiting shipment. We hold that it may.

 Although Article I, Section 10, Clause 2, of the Constitution prohibits a state from imposing a duty on exports, property within the state is not exempt from taxation solely because it may be exported in the future. *See, e. g.,* Empresa Siderurgica, S.A. v. Merced County, 337 U.S. 154, 69 S.Ct. 995, 93 L.Ed. 1276 (1949). The exemption from taxation attaches only after the property has entered the export process. The problem is to define the point at which that process begins. Kosydar v. National Cash Register Co., 417 U.S. 62, 70–71, 94 S.Ct. 2108, 40 L.Ed.2d 660 (1974). Appellant county contends that the logs do not begin the export process until they are loaded on the ship to be transported to Japan. Appellee Sumitomo argues that logs stored at the port awaiting the first available ship have begun the export process and are exempt from taxation.

Sumitomo's position must be rejected as it is contrary to the holding in Coe v. Errol, 116 U.S. 517, 6 S.Ct. 475, 29 L.Ed. 715 (1886). In *Coe* the Court was concerned with the point at which goods enter the stream of interstate commerce and thereby become protected by the Interstate Commerce Clause from certain local taxation. Although *Coe* dealt with the Interstate Commerce Clause, its standard for the point at which goods commence an interstate journey has been explicitly adopted to determine the point at which goods commence a foreign journey and thereby become "exports" under Article I, Section 10, Clause 2. Kosydar v. National Cash Register Co., *supra,* at 71, 94 S.Ct. 2108; Empresa Siderurgica, S.A. v. Merced County, *supra* at 156, 69 S.Ct. 995; Richfield Oil Corp. v. State Board, 329 U.S. 69, 79, 67 S.Ct. 156, 91 L.Ed. 80 (1946).

Applying the *Coe* standard to Sumitomo's logs, it is clear that they had not yet become "exports" immune from local taxation when the *ad valorem* tax was levied. In *Coe* the Court considered two collections of logs. The first had been cut in Maine and floated down the Androscoggin River enroute to another lo-

---

2. Sumitomo's purchases exceeded orders by 10%, but this was merely "to account for those unavoidable problems which necessarily arise when dealing with a semi-perishable commodity."

cation in Maine. The course of the River took the logs through the town of Errol, New Hampshire, where they were delayed by low water. The Court held that these logs were merely passing through New Hampshire and were already in the course of commercial transportation. Therefore, they enjoyed constitutional protection from taxation. 116 U.S. at 525, 6 S.Ct. 475.

The second crop of logs had been cut in New Hampshire and brought to Errol to be floated out of state. The logs were floated in and placed on the banks of a tributary of the Androscoggin River awaiting commencement of the journey. The Court held that the logs had not yet begun their journey and were not constitutionally protected:

> There must be a point of time when [the logs] cease to be governed exclusively by the domestic law and begin to be governed and protected by the national law of commercial regulation, and that moment seems to us to be a legitimate one for this purpose, in which they commence their final movement for transportation from the State of their origin to that of their destination. When the products of the farm or the forest are collected and brought in from the surrounding country to a town or station serving as an entrepôt for that particular region, whether on a river or a line of railroad, such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to State of their destination, or have started on their ultimate passage to that State.

116 U.S. at 525, 6 S.Ct. at 477.

■ Sumitomo's logs are in the same position as the second collection of logs in *Coe.* They were cut in the forests of Washington state and taken to an entrepôt within that state, the port of Olympia, to await shipment out of the state. They had neither been committed to a common carrier for export, A. G. Spalding & Bros. v. Edwards, 262 U.S. 66, 43 S.Ct. 485, 67 L.Ed. 865 (1923), nor loaded upon the ship that would take them to Japan, Richfield Oil Corp. v. State Board, *supra*.[3] Neither *Spalding, Richfield,* nor any other case of which we are aware, suggests that *Coe* is no longer controlling in cases presenting similar facts. To the contrary, both *Richfield* and Empresa Siderurgica, S.A. v. Merced County, *supra,* cite *Coe* approvingly and rely on its standard. Any doubt of the viability of Coe v. Errol has been dispelled by the language in *Kosydar*.[4] Thus, under *Coe,* Sumitomo's logs were not "exports" while stored at the port awaiting shipment.

■ Sumitomo makes two counter arguments to support its position. First, it argues that the quality of the logs, the contractual and financial arrangements covering them, and Sumitomo's past practices indicated with reasonable certainty that the logs would be exported. Thus, there was no reasonable probability that the logs would be di-

---

3. Although *Spalding* and *Richfield* involved sales taxes, each result explicitly depended on the point at which the goods commenced their journey and thereby became "exports."

4. Noting that the Court had adhered to the basic principle of Coe v. Errol for the nearly 90 years since that case was decided, Kosydar v. National Cash Register Co., *supra,* at 67, 94 S.Ct. 2108, Justice Stewart, writing for a unanimous Court, stated:

> It may be said that insistence upon an actual movement into the stream of export in the case at hand represents an overly wooden or mechanistic application of the *Coe* doctrine. This is an instance, however, where we believe that simplicity has its virtues. The Court recognized long ago that even if it is not an easy matter to set down a rule determining the moment in time when articles obtain the protection of the Import-Export Clause, "it is highly important, both to the shipper and to the State, that it should be clearly defined so as to avoid all ambiguity or question." *Coe, supra,* 116 U.S. at 526, 6 S.Ct. at 478.

*Id.* at 71, 94 S.Ct. at 2113.

verted to the domestic market after escaping taxation.

There is some case law support for the conclusion that certainty of exportation is a criterion for determining whether exportation has begun. In *Richfield* the Court concluded that oil became an "export" when loaded on a ship bound for a foreign destination, even though the ship was not a common carrier. The Court reasoned that the theoretical possibility of diversion to the local market should be overlooked because it was reasonably certain that the oil was going to be delivered outside the United States. 329 U.S. at 82–83, 67 S.Ct. 156.

The reliance on the certainty of export in *Richfield* was, however, used merely to excuse the fact that the ship was not a common carrier. Certainty of export evidenced by financial and contractual relationships does not by itself render goods "exports" before the commencement of their journey abroad. Empresa Siderurgica, S.A. v. Merced County, *supra* at 156–157, 69 S.Ct. 995.[5] Thus even if we "accept as fact the [appellee's] assurances that the prospect of eventual exportation here was virtually certain," the immunities of the Import-Export Clause are unavailable absent an actual entrance of the appellee's logs into the export stream. Kosydar v. National Cash Register Co., *supra*, at 70, 94 S.Ct. 2108.[6] Since nothing in *Richfield* undermines *Coe* on the question of when the journey begins, the fact that diversion to the domestic market was unlikely does not remove Sumitomo's logs

from the "entrepôt" standard *Coe* announced.

Second, Sumitomo argues that Carson Petroleum Co. v. Vial, 279 U.S. 95, 49 S. Ct. 292, 73 L.Ed. 626 (1929), controls this case and undermines the validity of *Coe*. In *Carson,* oil was being transported from Texas, Oklahoma, and Kansas to Europe. The journey consisted of railroad transportation through Louisiana to a location near New Orleans. There the oil was transferred to shore tanks to await the arrival of ships for the ocean voyage. Shore based storage tanks were used to avoid the necessity of ships being delayed awaiting the arrival of sufficient oil to comprise a full load, and all oil stored was awaiting the arrival of a ship for transportation to Europe. The Court held that Louisiana could not tax the oil being stored awaiting an available vessel.

■ Sumitomo argues that, as with the oil in *Carson,* its logs were being stored at the port only to await the arrival of a ship to transport them to Japan. This is true. But unlike the oil in *Carson,* Sumitomo's logs had not been traveling interstate prior to their storage at the Port of Olympia. *Carson* involved the interruption of an interstate/international journey that had admittedly begun long before the oil reached New Orleans. The Court held merely that when such a journey is interrupted by a geographically necessary change in transportation modes, reasonable delays and inventories to facilitate that change do not cause the goods to cease being "ex-

---

5. *See also* Cornell v. Coyne, 192 U.S. 418, 24 S.Ct. 383, 48 L.Ed. 504 (1904). *Cornell* involved Article I, Section 9, Clause 5, which prohibits Congress from levying a tax on goods "exported from any State." But this difference is irrelevant for determining the point at which the exportation process begins. Empresa Siderurgica, S.A. v. Merced County, *supra* at 156 & n. 2, 69 S.Ct. 995. Richfield Oil Corp. v. State Board, *supra* at 83, 67 S.Ct. 156.

6. The likelihood of eventual exportation was probably even greater in *Kosydar* than under

the facts presented in this case. The taxpayer in *Kosydar* was engaged in the manufacture of business machines, and its wholly separate international division did not commence manufacture until actual receipt of foreign orders. The machines produced were designed for the peculiar foreign market, using unique keyboards, characters, and decimal point placement, and quite often were designed to utilize the electric supply of the foreign country which often differs from that in standard use in this country. Each machine so constructed was eventually exported, and none ever re-entered the domestic market.

ports" or "goods in interstate commerce." Thus, *Carson* involved a situation similar to the first group of logs in *Coe* which were delayed by low water during their journey through New Hampshire.

Sumitomo's logs, on the other hand, were not interrupted on a journey through Washington from another state to a foreign destination. They were, like the second group of logs in *Coe*, products of Washington taken to an entrepôt from surrounding areas within the state.[7] Thus, under the holding of *Coe* they had not yet become "exports" falling under the protection of Article I, Section 10, Clause 2.

It is true that *Carson* did not explicitly distinguish the oil delayed at the port from the logs collected at the entrepôt in *Coe* on the basis that the former had begun its journey in another state. Thus, it is not unreasonable for Sumitomo to contend that *Carson* casts doubt on the validity of *Coe*. But since *Coe* has been explicitly approved and its standard relied on in *Richfield, Empresa Siderurgica*, and most recently, in *Kosydar*— all decided after *Carson*—Sumitomo's interpretation of *Carson* must be rejected.

The logs upon which Thurston County levied its *ad valorem* tax had not yet become "exports" entitled to the protection of Article I, Section 10, Clause 2, of the United States Constitution. The judgment of the district court is reversed, and the case is remanded for entry of judgment in favor of appellant county.

---

7. Although we rely on the difference between out-of-state and in-state goods delayed at the water's edge, we do not hold that this distinction is necessarily conclusive in all factual situations. Specifically, we infer no holding concerning the situation where goods are consigned to a common carrier within a state for out-of-state shipment but are delayed at the interface of two modes of transportation prior to leaving the state while still within the control of the common carrier. *See* Empresa Siderurgica v. Merced County, *supra* at 156–157, 69 S.Ct. 995; A. G. Spalding & Bros. v. Edwards, *supra*, Coe v. Errol, *supra* at 525, 6 S.Ct. 475. Nor do we intimate an opinion on the situation where goods are delivered to a port from out of state but are delivered to the control of the shipper. *See* General Oil Co. v. Crain, 209 U.S. 211, 28 S.Ct. 475, 52 L.Ed. 754 (1908). Finally, we note that the tax imposed on Sumitomo's logs was not levied for the reason that they were intended for exportation. *See* Coe v. Errol, *supra* at 525–526, 6 S.Ct. 475.