[S.F. No. 23254. In Bank. June 23, 1975.]

FARMERS' RICE COOPERATIVE, Plaintiff and Respondent, v. COUNTY OF YOLO, Defendant and Appellant.

**COUNSEL**

Charles R. Mack, County Counsel, Walter I. Colby, Chief Deputy County Counsel, and Robert A. Rundstrom, Deputy County Counsel, for Defendant and Appellant.

Raymond W. Schneider, County Counsel, as Amicus Curiae on behalf of Defendant and Appellant.

Marshall E. Leahy and John F. O'Dea for Plaintiff and Respondent.

**OPINION**

**THE COURT.**—In this action for recovery of personal property taxes paid under protest, defendant County of Yolo appeals from a judgment entered after a nonjury trial in favor of plaintiff and against defendant for the recovery of said taxes in the sum of $16,128.29 together with interest and costs. After decision by the Court of Appeal, First Appellate District, Division One, reversing the judgment, we granted a hearing in this court for the purpose of giving further consideration to the issues raised and of eliminating any conflict among decisions of the Courts of Appeal. Having made a thorough examination of the cause, we have concluded that the opinion of the Court of Appeal prepared by Justice Elkington and concurred in by Presiding Justice Molinari and Justice Sims correctly treats and disposes of the issues involved and we adopt such opinion as and for the opinion of this court. Such opinion (with appropriate additions and deletions) is as follows:*

---

*Brackets together, in this manner [ ] *without enclosing material,* are used to indicate deletions from the opinion of the Court of Appeal; brackets *enclosing material* (other than editor's added parallel citations) are, unless otherwise indicated, used to denote insertions or additions by this court. We thus avoid the extension of quotation marks within quotation marks, which would be incident to the use of such conventional

The appeal before us concerns the export-import clause of article I, section 10, clause 2, of the United States Constitution which, as relevant here, provides: "No State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, . . ."

The action below was tried on stipulated facts which for our purposes may reasonably be condensed to the following.

Plaintiff Farmers' Rice Cooperative (hereafter "Cooperative") is a nonprofit cooperative marketing association. It mills and markets rice grown by its members of northern and central California. The Sacramento-Yolo Port District maintains dockside elevator facilities in Yolo County in which rice may be accumulated and then conveniently loaded in bulk aboard ocean going vessels. In February 1967, Cooperative had contracted for the sale and delivery of more than 11,000,000 pounds of rice to buyers in Okinawa and Puerto Rico. On March 6, 1967 (the county personal property tax assessment date), 8,502,000 pounds of this rice had been delivered by Cooperative to the dockside facilities toward fulfillment of the orders. All of it had been grown and milled in California and no contention is made that it had ever entered the stream of interstate commerce. An agreement with the port district provided that "ultimate disposition of the rice is governed by [Cooperative's] instructions." The balance of the rice necessary to complete the transactions was delivered after March 6, and all in due course was shiploaded and delivered abroad to its purchasers.

The Yolo County Assessor assessed, as personal property of Cooperative, the 8,502,000 pounds of rice which was resting in the port district's elevators on March 6, 1967. The resulting tax was paid under protest by Cooperative, and the instant action was commenced against Yolo County for its recovery.

Judgment was entered for Cooperative by the superior court. Yolo County's appeal is from that judgment.

■ The question presented is whether goods originating in California which, while under control of their owner, are accumulated for

_____

punctuation, and at the same time accurately indicate the matter quoted. In so doing, we adhere to a method of adoption employed by us in the past. (See *Chicago Title Ins. Co.* v. *Great Western Financial Corp.* (1968) 69 Cal.2d 305, 311, fn. 2 [70 Cal.Rptr. 849, 444 P.2d 481], and cases there cited.)

export under existing contracts of sale in dockside facilities of a public authority, have entered upon the "process of exportation."

[ ] ■ [The export-import clause imposes on all states an absolute prohibition against taxing exports without the consent of Congress. One of the main purposes of the clause was to eliminate any advantage the seaboard states might have in laying duties on goods and produce sent there from other states for export. "It was important not to allow these States to take advantage of their favorable geographical position in order to exact a price for the use of their ports from the consumers dwelling in less advantageously situated parts of the country. This fear of the use of geographical position to exact a form of tribute found an especially forceful expression in the absolute prohibition against duties on exports by either Nation or States." (*Youngstown Co.* v. *Bowers* (1958) 358 U.S. 534, 556-557 [3 L.Ed.2d 490, 504-505, 79 S.Ct. 383], Frankfurter, J. dissenting; *Cook* v. *Pennsylvania* (1878) 97 U.S. 566, 574 [24 L.Ed. 1015, 1018]; *Woodruff* v. *Parham* (1868) 75 U.S. (8 Wall.) 123, 135 [19 L.Ed. 382, 385-386].) Thus once goods are actually in the process of exportation, that is have become "exports," their immunity from state taxation is absolute.

However, although goods which are the products of a state may be intended for exportation, until they become "exports" within the meaning of the constitutional provision, such goods do not cease to be part of the general mass of property in the state and as such within its jurisdiction and subject to taxation in the usual way. (*Cornell* v. *Coyne* (1903) 192 U.S. 418, 427-428 [48 L.Ed. 504, 507-508, 24 S.Ct. 383]; *Coe* v. *Errol* (1885) 116 U.S. 517, 527-528 [29 L.Ed. 715, 718-719, 6 S.Ct. 475].) "The Export-Import Clause was meant to confer immunity from local taxation upon property being exported, not to relieve property eventually to be exported from its share of the cost of local services." (*Joy Oil Co.* v. *State Tax Comm'n.* (1948) 337 U.S. 286, 288 [93 L.Ed. 1366, 1369, 69 S.Ct. 1075]; *Kosydar* v. *National Cash Register Co.* (1974) 417 U.S. 62, 70 [40 L.Ed.2d 660, 666-667, 94 S.Ct. 2108].) Therefore] in determining whether such goods *are* in the process of exportation, courts will pay proper respect to the competing constitutional demand that a state's right to tax goods produced within its borders and benefitted by its tax supported services, shall not be unduly curtailed. [Otherwise, seaboard states would be unfairly disadvantaged themselves. "It seems to us untenable to hold that a crop or a herd is exempt from taxation merely because it is, by its owner, intended for exportation. If such were the rule in many States there would be nothing but the lands and real estate to

bear the taxes." (*Coe* v. *Errol, supra,* 116 U.S. 517, 527-528 [29 L.Ed. 715, 718-719].)]

On the issue at hand we are offered a mass of seemingly relevant authority by the parties, much of which appears mutually inconsistent. But on closer examination much of the contradiction disappears. The subject cases are often based upon different factual contexts to which different constitutional principles apply. For a better understanding, we shall endeavor to place this divergent authority in its appropriate and logical categories.

The first category consists of cases where the movement of goods, conceded or found to have been in the *stream of interstate commerce,* had ended. They embrace situations where there had been, for one cause or another, a temporary cessation of such travel, or where the goods had reached their ultimate destination. The issue is whether the goods were still in the stream of interstate commerce, and therefore exempt from state taxation under the commerce clause, article I, section 8, clause 3, of the Constitution. These cases, arising under factual contexts wholly dissimilar to that of the case at bench, and under inapposite constitutional edicts and principles, are found to be of little value to our inquiry whether the rice at hand had *entered upon the process of exportation.*[1]

The second grouping of cases found to be of scant relevance to our problem concerns goods produced in one state, from which state they have *commenced their export journey* toward another state's deep water harbor for shipment abroad. Here it is the tidewater state that seeks to tax goods already in the process of exportation, the state of affairs feared by the Constitution's framers, and decried in *Woodruff* v. *Parham, supra,* 75 U.S. (8 Wall.) 123, 135 [19 L.Ed. 382, 385-386], and *Cook* v. *Pennsylvania, supra,* 97 U.S. 566, 574 [24 L.Ed. 1015, 1018]. The tax is usually sought when the subject goods lie on the dock, or in dockside tanks, awaiting shiploading and transportation abroad. At that point, taxation of the goods already in the process of exportation would obviously do violence to the export-import clause and it is uniformly so held. It is notable in such cases that the goods, merely passing through

---

[1]The proffered authorities are: *McGoldrick* v. *Berwind-White Co.* (1939) 309 U.S. 33 [84 L.Ed. 565, 60 S.Ct. 388, 128 A.L.R. 876]; *Minnesota* v. *Blasius* (1933) 290 U.S. 1 [78 L.Ed. 131, 54 S.Ct. 34]; [ ] *Susquehanna Coal Co.* v. *South Amboy* (1912) 228 U.S. 665 [57 L.Ed. 1015, 33 S.Ct. 712]; [ ] *General Oil Co.* v. *Crain* (1907) 209 U.S. 211 [52 L.Ed. 754, 28 S.Ct. 475]; *Von Hamm-Young Co.* v. *San Francisco* (1947) 29 Cal.2d 798 [178 P.2d 745, 171 A.L.R. 274].

the state from which they will be shipped abroad, have benefited little from that state's tax supported services and facilities.[2]

It is only the third category of such cases that we find to be of substantial aid to us. Some of these relate to the commerce clause and concern the question whether goods had *entered the stream of interstate commerce,* and were therefore nontaxable by a state. The remainder concern the export-import clause; the issue there is whether goods were in the *process of exportation* and accordingly beyond reach of a state's tax process. The tests as to each of these classifications are identical. (See *Kosydar* v. *National Cash Register Co., supra,* 417 U.S. 62, 67 [40 L.Ed.2d 660, 665]; *Empresa Siderurgica* v. *Merced Co.* (1948) 337 U.S. 154, 156 [93 L.Ed. 1276, 1279, 69 S.Ct. 995]; *Richfield Oil Corp.* v. *State Board* (1945) 329 U.S. 69, 79 [91 L.Ed. 80, 91, 67 S.Ct. 156]; *Shell Oil Co.* v. *State Bd. of Equal.* (1966) 64 Cal.2d 713, 721 [51 Cal.Rptr. 524, 414 P.2d 820]; *Sumitomo Forest. Co., Ltd. of Japan* v. *Thurston Cty., Wash.* (9th Cir. 1974) 504 F.2d 604, 606.)

■ The uniform test whether goods have entered the "stream of interstate commerce" or the "process of exportation" was early stated by the United States Supreme Court in *Coe* v. *Errol,' supra,* 116 U.S. 517, 527 [29 L.Ed. 715, 719], as follows: "[G]oods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until [1] *they have been shipped, or entered with a common carrier for transportation to another State [or country] or [2] have been started upon such transportation in a continuous route or journey.*"[3] (Italics added.)

The rule of *Coe* v. *Errol* remains the law today. Referring to that decision the Supreme Court has recently said: "This Court has adhered to that principle in the almost 90 years since Coe was decided." (*Kosydar* v. *National Cash Register Co., supra,* 417 U.S. 62, 67 [40 L.Ed.2d 660, 665].) It is regularly applied, as against state attempts to tax, in determining whether a state's goods have entered the *"stream of interstate commerce"* (see *Heisler* v. *Thomas Colliery Co.* (1922) 260 U.S.

---

[2]Among such cases are: *Carson Petroleum Co.* v. *Vial* (1928) 279 U.S. 95 [73 L.Ed. 626, 49 S.Ct. 292]; *So. Pac. Terminal Co.* v. *Int. Comm. Comm.* (1910) 219 U.S. 498 [55 L.Ed. 310, 31 S.Ct. 279].

[3]"Although *Coe* dealt with the Interstate Commerce Clause, its standard for the point at which goods commence an interstate journey has been expicitly adopted to determine the point at which goods commence a foreign journey and thereby become 'exports' under Article I, Section 10, Clause 2." (*Sumitomo Forest. Co., Ltd. of Japan* v. *Thurston Cty., Wash., supra,* 504 F.2d 604, 606; and see the authority there cited.)

245, 260-261 [67 L.Ed. 237, 243-244, 67 S.Ct. 237]; *Bacon* v. *Illinois* (1912) 227 U.S. 504, 512-514 [57 L.Ed. 615, 618-619, 33 S.Ct. 299]; *Diamond Match Co.* v. *Ontonagon* (1902) 188 U.S. 82, 93-95 [47 L.Ed. 394, 398-399, 23 S.Ct. 266]; [ ]) *or* are in the *"process of exportation"* (see *Kosydar*.v. *National Cash Register Co., supra,* 417 U.S. 62, 65-70 [40 L.Ed.2d 660, 663-667]; *Empresa Siderurgica* v. *Merced Co., supra,* 337 U.S. 154, 156 [93 L.Ed. 1276, 1279]; *Richfield Oil Corp.* v. *State Board, supra,* 329 U.S. 69, 79 [91 L.Ed. 80, 91]; *Shell Oil Co.* v. *State Bd. of Equal., supra,* 64 Cal.2d 713, 720-721).

The application of the several rules and constitutional considerations we have discussed, is well pointed up in *Coe* v. *Errol, supra,* 116 U.S. 517. There one Coe had gathered logs in the Town of Errol, New Hampshire, on the banks of, or upon, the Androscoggin River. The logs were destined for "export" downstream to the State of Maine. Some had originated upstream in a sister state, while the remainder were produced in New Hampshire. The town sought to tax the logs, bringing about litigation which reached the high court. Giving effect to the constitutional concern against taxation of goods in the process of exportation by a state through which the goods must pass, the court held the logs from the upstream state to be immune from the Town of Errol's taxation efforts. But since the reason for that principle did not apply to the logs produced in the taxing state, the town's assessment of taxes against those logs was sustained.

Referring to the locally produced logs the high court had asked the question (116 U.S. at pp. 524-525 [29 L.Ed. at p. 718]): "Are the products of a State, although intended for exportation to another State and partially prepared for that purpose by being *deposited at a place or port of shipment within the State,* liable to be taxed like other property within the State?" (Italics added.) (The question would seem equally appropriate to the issue of the case at bench.)

The court then answered its question in this manner (116 U.S. at p. 525 [29 L.Ed. at p. 718]): The process of exportation and thus freedom from state taxation commenced when the logs were "actually started in the course of transportation to another State, or delivered to a carrier for such transportation," or at the moment "in which they commence their *final movement for transportation* from the State of their origin [New Hampshire] to that of their destination. When the products of the . . . forest are collected and brought in from the surrounding country to a town or station serving as an *entrepôt* for that particular region, whether

on a river or a line of railroad, *such products are not yet exports, nor are they in process of exportation, nor is exportation begun until they are committed to the common carrier for transportation out of the State to the State of their destination, or have started on their ultimate passage to that State.* Until then it is reasonable to regard them as not only within the State of their origin, but as a part of the general mass of property of that State, subject to its jurisdiction, and liable to taxation there, if not taxed by reason of their being intended for exportation, but taxed without any discrimination, in the usual way and manner in which such property is taxed in the State." (Italics added.)

The high court has since stated the same rule in different ways. We refer to a few such decisions.

*Cornell* v. *Coyne, supra,* 192 U.S. 418, 427 [48 L.Ed. 504, 507-508]: "The true construction of the constitutional provision is that no burden by way of tax or duty can be cast upon the exportation of articles, and does not mean that articles exported are relieved from the prior ordinary burdens of taxation which rest upon all property similarly situated. *The exemption attaches to the export and not to the article before its exportation.* Such has been the ruling of this court." (Italics added.)

*Empresa Siderurgica* v. *Merced Co., supra,* 337 U.S. 154, 156-157 [93 L.Ed. 1276, 1279-1280]: "Under that test [of *Coe* v. *Errol*] it is not enough that there is an intent to export, or a plan which contemplates exportation, or an integrated series of events which will end with it. . . . Delivery of packages to an exporting carrier for shipment abroad . . . and the delivery of oil into the hold of the ship furnished by the foreign purchaser to carry the oil abroad . . . have been held sufficient. *It is the entrance of the articles into the export stream that marks the start of the process of exportation.* Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. *Nothing less will suffice.* [¶] So in this case it is not enough that on the tax date there was a purpose and plan to export this property. Nor is it sufficient that in due course that plan was fully executed." (Italics added.)

*Canton R. Co.* v. *Rogan* (1950) 340 U.S. 511, 515 [95 L.Ed. 488, 493, 71 S.Ct. 447, 20 A.L.R.2d 145]: *"To export means to carry or send abroad; to import means to bring into the country. Those acts begin and end at water's edge.* The broader definition which appellant tenders distorts the ordinary meaning of the terms. It would lead back to every forest, mine,

and factory in the land and create a zone of tax immunity never before imagined. *For if the handling of the goods at the port were part of the export process,* so would hauling them to or from distant points or perhaps mining them or manufacturing them. The phase of the process would make no difference so long as the goods were in fact committed to export or had arrived as imports." (Italics added.) [ ]

■■■ *Kosydar* v. *National Cash Register Co., supra,* 417 U.S. 62, must be deemed the final authoritative word on the subject. Reviewing earlier authority, that case tells us that " 'it is not enough that there is an intent to export, or a plan which contemplates exportation, or an integrated series of events which will end in it.' " The process of exportation does not begin "until the article at issue begins its *physical entry* into the stream of exportation." (Italics added.) There is such a "physical entry" when the goods have been delivered on shipboard for their delivery abroad, or have been delivered to a common carrier for such foreign transportation "in a continuous route or journey." And commencement of transportation to, or storage of goods in, a warehouse or entrepot, or other collection point within the state of the goods' production, does not constitute a physical entry into the stream of exportation.

From the foregoing authorities it will be seen that Cooperative's delivery of California-grown rice to, and its storage in, the port district's elevators were no part of the process of exportation. That process would have begun when the goods had crossed the "water's edge," or had been [ ] [delivered] to a common carrier for the "continuous route or journey" abroad. The "handling of the [rice] at the port [was no] part of the export process."

Cooperative suggests that the rice was delivered to the port district's facilities by "common carrier," thus commencing the exportation process. The record does not support the statement; it shows no more than that a small part of the rice at issue was so delivered by a "common carrier," a railroad. But were we to assume, arguendo, such a common carrier delivery, the argument must nevertheless fail. *Coe* v. *Errol,* and its numerous progeny, make it clear that it is only entry with a common carrier for *transportation to the goods' ultimate destination,* that will suffice. Use of such a common carrier to carry the goods from one resting place to another within the state, and prior to movement abroad, is insufficient. Illustrations where delivery to a common carrier for transportation abroad has been found to commence the process of exportation are found in *Spalding & Bros.* v. *Edwards* (1922) 262 U.S. 66, 69 [67

L.Ed. 865, 867, 43 S.Ct. 485] (goods [ ] [delivered] "to the carrier that was to take them across the sea"), *Louisiana R.R. Comm.* v. *Tex. & Pac. Ry.* (1912) 229 U.S. 336, 338 [57 L.Ed. 1215, 1217-1218, 33 S.Ct. 837] (carrier ordered to deliver the freight to certain steamships where it is "loaded on board . . . and transported to foreign ports and countries"), and *Gough Industries* v. *State Board of Equal.* (1959) 51 Cal.2d 746, 747 [336 P.2d 161] (goods delivered "directly to a carrier or a forwarding agent for shipment to a point outside the United States"). We find no high authority where delivery to a common carrier for purely intrastate transportation has, as here suggested, been held to trigger the process of exportation.

Cooperative next argues that the true indicator that the process of exportation has commenced is "certainty that the goods are headed to sea." Relied upon is *Richfield Oil Corp.* v. *State Board, supra,* 329 U.S. 69, 82 [91 L.Ed. 80, 92]. (That case also states (p. 82 [91 L.Ed. at pp. 92-93]) that the required "degree of certainty may exist though no common carrier is involved." But the only exception pointed out by the court was where the goods (there oil) were delivered into the hold of the ocean going vessel.)

Here again we are unable to find ultimate authority that intrastate delivery and accumulation of goods at dockside by their owner, with the intent to ship them abroad, creates the necessary certainty. Indeed, as we have pointed out, a long line of United States Supreme Court cases clings to the rule of *Coe* v. *Errol, supra,* 116 U.S. 517, that under such circumstances the required certainty has not been reached. As said in *Empresa Siderurgica* v. *Merced Co., supra,* 337 U.S. 154, 157 [93 L.Ed. 1276, 1280], *certainty* is acquired upon "the entrance of the articles into the export stream"; and that "[n]othing less will suffice." Examples of such *certainty* expressed by that court were where delivery was made "to an exporting carrier for shipment abroad," and "into the hold of the ship."

Referring to the concept of "certainty" of export it was said in *Sumitomo Forest. Co., Ltd. of Japan* v. *Thurston Cty., Wash., supra,* 504 F.2d 604, 608: "The reliance on the certainty of export in *Richfield* was, however, used merely to excuse the fact that the ship was not a common carrier. Certainty of export evidenced by financial and contractual relationships does not by itself render goods 'exports' before the commencement of their journey abroad. *Empresa Siderurgica, S.A.* v. *Merced County, supra,* at 156-157, 69 S.Ct. 995. Thus even if we 'accept as

fact the [appellee's] assurances that the prospect of eventual exportation here was virtually certain,' the immunities of the Import-Export Clause are unavailable absent an actual entrance of the appellee's logs into the export stream. *Kosydar* v. *National Cash Register Co., supra,* at 70, 94 S.Ct. 2108. Since nothing in *Richfield* undermines *Coe* on the question of when the journey begins, the fact that diversion to the domestic market was unlikely does not remove Sumitomo's logs from the 'entrepôt' standard *Coe* announced:" (Fns. omitted.)

Moreover, although not essential to our disposition of the appeal, we observe that in the instant case the exact amount of Cooperative's dockside rice to be exported was unknown, creating "the possibility of rice remaining in the Port bins after the ship sails," and further, that: "It is possible that rice delivered to the Port may be made available to another supplier to enable that supplier to meet a commitment. An arrangement, then, is made for replacement." These considerations further reduce the certainty that Cooperative's "goods [were] headed to sea."

We now advert to a conflict on the subject at hand appearing from decisions of the Court of Appeal of this state.

*Rice Growers' Association of California* v. *County of Yolo* (1971) 17 Cal.App.3d 227 [94 Cal.Rptr. 847], *Hugo Neu Corp.* v. *County of Los Angeles* (1970) 7 Cal.App.3d 21 [86 Cal.Rptr. 332], and *Hugo Neu Corp.* v. *County of Los Angeles* (1966) 241 Cal.App.2d 703 [50 Cal.Rptr. 916], have closely followed the rule of *Coe* v. *Errol* and its adherent cases. They hold, that goods originating in California, collected by their owner at a California seaport for the purpose of transportation abroad, were not in the process of exportation and were therefore taxable by the county in which they awaited exportation. [ ]

[Cooperative relies principally upon *Cargill of California, Inc.* v. *County of Yolo* (1972) 26 Cal.App.3d 704 [103 Cal.Rptr. 257], where, in a factual setting almost identical to the one at bench, the court deviated from the rule of *Coe* v. *Errol, supra.* There the same county taxed alfalfa pellets stored in dockside elevators for future export to Japan. The pellets had been produced in California and accumulated at the elevators in anticipation of the arrival of one vessel a month for loading. The court, relying on *Carson Petroleum Co.* v. *Vial, supra,* 279 U.S. 95, concluded that the export journey commenced when the pellets were delivered to the dockside elevators. However, the opinion failed to

recognize the crucial fact that the oil involved in *Carlson* having been produced in another state, had already commenced its export journey there upon delivery to a common carrier, whereas in *Cargill* the alfalfa pellets having been produced in California, had neither crossed the water's edge nor been delivered to a common carrier for transport to their ultimate destination.

Cooperative also relies upon *Montrose Chemical Corp.* v. *County of Los Angeles* (1966) 243 Cal.App.2d 300 [52 Cal.Rptr. 209], which held that D.D.T. concentrate stored in the manufacturer's warehouse for export was exempt from taxation since it could not be sold in the United States and was certain to be exported. The United States Supreme Court in *Kosydar* v. *National Cash Register Co., supra,* 417 U.S. 62, involving a similar situation, has declared that certainty of exportation is not in itself sufficient but that there must also be a movement commencing the export journey. *Cargill of California, Inc.* v. *County of Yolo, supra,* 26 Cal.App.3d 704, and *Montrose Chemical Corp.* v. *County of Los Angeles, supra,* 243 Cal.App.2d 300, are disapproved.

For the reasons explained above, we have determined that the judgment of the superior court must be reversed.

In view of this disposition, it is unnecessary for us to reach Yolo County's contention that since Puerto Rico is not a foreign country rice destined for Puerto Rico cannot be considered as involved in the process of exportation.

The judgment is reversed and the cause is remanded to the trial court with directions to amend the findings of fact and conclusions of law and to enter judgment in favor of defendant in conformity with the views herein expressed.]