[No. B061726. Second Dist., Div. One. Nov. 10, 1992.]

McDONNELL DOUGLAS CORPORATION, Plaintiff and Appellant, v. STATE BOARD OF EQUALIZATION, Defendant and Respondent.

1414

**COUNSEL**

Latham & Watkins, Albert R. Rodriguez, Robert D. Crockett and Deanna W. Detchemendy for Plaintiff and Appellant.

Daniel E. Lungren, Attorney General, Timothy G. Laddish, Assistant Attorney General, Edmond B. Mamer and Anthony F. Sgherzi, Deputy Attorneys General, for Defendant and Respondent.

## OPINION

## ORTEGA, J.—

### INTRODUCTION

Plaintiff McDonnell Douglas Corporation (MDC) sold aircraft parts to Aeromexico, the Mexican national airline, to service Aeromexico's airplanes. Aeromexico received the parts at MDC's Long Beach plant and shipped them by United States (U.S.) common carriers to the U.S.-Mexican border at San Ysidro, California, where AM MEX International, a forwarding agent, processed them through U.S. and Mexican customs. After a 48-hour customs delay, the parts were loaded onto Mexican common carriers and shipped to Aeromexico's Mexico City maintenance facility.

Although the U.S. Constitution and the Revenue and Taxation Code[1] exempt exports from state sales taxes, defendant California State Board of Equalization (the Board) assessed MDC sales tax on the parts. The Board claimed that the parts were not in the "export stream" until they left the border and thus were subject to sales tax. MDC paid the tax under protest and sued the Board for a refund. After a court trial, the trial court entered judgment for the Board. MDC appeals. We agree with MDC that the parts were in the "export stream" and thus were sales-tax-exempt exports. We reverse the judgment.

### FACTS

Beginning in 1968, MDC sold Aeromexico aircraft parts to service Aeromexico's airplanes, nearly all of which were MDC manufactured. MDC produced nearly all the parts at its Long Beach factory. Aeromexico's primary service and maintenance facility was in Mexico City. Between January 1, 1978, and December 31, 1980, the period for which the Board assessed the disputed tax, MDC delivered approximately 8,000 such orders, averaging about 10 each working day, worth nearly $7 million, to Aeromexico. All orders originated in Mexico, showed Mexico City as the destination, and stated that the parts were for export to Mexico. Aeromexico received and took title to the parts free on board (f.o.b.) in Long Beach. Aeromexico's regular flights between Los Angeles and Mexico City were almost all passenger flights on small, narrow-bodied, twin-engine DC-9 aircraft incapable of carrying more than a small percentage of the parts. Moreover,

---

[1]Unless otherwise indicated, all further statutory references are to the Revenue and Taxation Code.

during the relevant years, Mexican law prohibited U.S. common carriers from operating in Mexico, and U.S. law permitted Mexican common carriers to operate in the U.S. only in the immediate border area.

Other than the few small items flown directly from Los Angeles to Mexico City on Aeromexico aircraft, on which the Board did not assess sales tax, Aeromexico shipped the parts, packaged for export, from Long Beach on U.S. common truck carriers to the U.S.-Mexican border at San Ysidro. Aeromexico retained title and the U.S. common carriers received possession. Separate lading bills were prepared at Long Beach and San Ysidro. Aeromexico had no maintenance or landing facilities at San Ysidro, which lacked rail connections or east-west transportation routes. At San Ysidro, Aeromexico employees assisted AM MEX, an independent freight forwarder, in processing the shipments through U.S. and Mexican customs. Aeromexico used AM MEX's facilities, expertise in U.S. and Mexican customs regulations and fees, and relationships with both countries' customs officials. AM MEX neither took title to the shipments nor was legally obligated to ship the parts to Mexico City. The shipments were not opened, inspected, or repackaged. After the approximately 48 hours required to complete customs processing, the parts were loaded onto Mexican common carriers and trucked to Mexico City. All the parts arrived in Mexico City.

The Board issued Aeromexico a registration certificate as a Mexican exporter, authorizing the San Ysidro transfers, in 1968 and continually renewed it during and after the relevant period. The Board did not assess sales tax on the shipments until January 1, 1978. MDC collected and paid sales tax on a small percentage of the shipments during the relevant period because in those few cases Aeromexico failed to provide MDC adequate documentation of the shipping process.

On July 3, 1985, the Board assessed MDC $348,413 in deficient sales tax and $291,476 in interest on the nearly $7 million of MDC's January 1, 1978, to December 31, 1980, Aeromexico parts sales. MDC paid the tax and interest under protest, petitioned for redetermination, and filed a refund claim. The Board denied the petition and claim. On April 8, 1988, MDC filed this case, seeking a refund. The case was tried to the court based on the facts alleged in the complaint, stipulated facts, and four witnesses' oral testimony.

The court found and entered judgment for the Board, stating: "1. As to the Export/Import clause: The Court finds that the repla[c]ement parts did not enter the stream of exportation until they left San Ysidro by Mexican

common carrier. As stated in . . . *Farmers' Rice [Cooperative* v. *County of Yolo* (1975) 14 Cal.3d 616 (122 Cal.Rptr. 65, 536 P.2d 465)] . . . and the Administrative Code, 'Export has not begun where property is transported from a point in this state to a warehouse or other collecting point in this state even though it is intended that the property then be transported, and is in fact, transported to another country.' The Court also finds that the parts had not started on their 'final and continuous journey' until they left San Ysidro. Thus, the Court concludes the replacement parts were not in the exportation process at the time they left [MDC] in Long Beach and were therefore taxable.

"2. As to . . . [s]ection 6385: The Court finds that [s]ection 6385 . . . does not qualify the sale between [19]78 & [19]81 as an exempt sale to a common carrier. The parts . . . were shipped by UPS or a US common carrier from Long Beach to San Ysidro and not by a facility of the purchasing carrier Aeromexico, as required by Sales and [Use] Tax Regulation 1621. Further the parts were not shipped to an out-of-state destination. In January of 1980, [s]ection 6385 was amended by adding subsection (b). Said subsection is not helpful to [MDC] because Aeromexico did not transport the parts itself. They were transported either by U.S. common carrier or Mexican common carriers.

"3. As to . . . [s]ection 6387: [s]ection 6387 is not applicable here because the evidence does not support the fact that Aeromexico is a 'forwarding agent, export packer, or other person engaged in the business of preparing goods for export or arranging for their exportation'. Also Annotation 325.1500 of the Business Taxes Law Guide holds that 'where an export packer is also a purchaser the exemption of [section] 6387 does not apply.'

"In making the above findings the Court considered the following facts: [¶] 1. Bills of Lading were issued not just in Long Beach, but also in San Ysidro. [¶] 2. The invoices show that the parts were to be shipped within . . . California by common U.S. carriers. [¶] 3. Once the parts left Long Beach, [MDC] lost control over the parts. [¶] 4. The parts were shipped from [MDC] to Aeromexico i[n] San Ysidro, CA. [¶] 5. Some of the invoices reflected that sales tax was billed to Aeromexico by [MDC]. [¶] 6. There was no evidence presented that the seller and purchaser agreed that a particular form of transportation was to take place between San Ysidro and Mexico City. In fact there was no contract between Am-Mex . . . and Aeromexico to deliver the parts to Mexico City. [¶] 7. There was no evidence showing that at the time of the purchase, other than delivery to San Ysidro, that a date of exportation was contemplated to and agreed upon by purchaser and seller.

[¶] 8. Unlike . . . *Gough* [*Industries v. State Board of Equal.* (1959) 51 Cal.2d 746 (336 P.2d 161)] . . . there was no exportation number received for the parts. [¶] 9. All customs arrangements for importing into Mexico were made after shipment had been made to San Ysidro."

## ISSUES

■ MDC contends the trial court erred because the Aeromexico parts sales were in the "export stream" and thus were sales-tax-exempt exports under the import-export clause of the U.S. Constitution and section 6352. MDC also contends sections 6385 and 6387 and California Code of Regulations, title 18, section 1621, which exempt from sales tax sales to common carriers and forwarding agents, and excuse compliance with lading bills procedures, bar the Board from imposing sales tax on the parts sales.[2]

## DISCUSSION

"This case was presented to the trial court upon stipulations of fact and oral and documentary evidence which supplemented the stipulations. As there was no conflict in the evidence the decisive facts are undisputed and we are confronted with questions of law and not bound by findings of the trial court. [Citations.]" *Mole-Richardson Co. v. Franchise Tax Bd.* (1990) 220 Cal.App.3d 889, 894 [269 Cal.Rptr. 662].) ■ "When presented with uncontradicted facts on appeal in tax matters, the appellate court is free to make its own determinations. [Citation.] Our review of the legal question at issue is undertaken independently and we are not bound by the trial court's determination." (*Rain Bird Sprinkler Mfg. Corp. v. Franchise Tax Bd.* (1991) 229 Cal.App.3d 784, 794 [280 Cal.Rptr. 362].) Thus, in reviewing the undisputed facts before us, we apply our independent judgment to this legal question.

■ "California's Sales and Use Tax Law (. . . § 6001 et seq.) acts as a 'double filter designed to catch all transactions' involving the purchase or enjoyment of tangible personal property *in this state*. [Citation.] The sales tax applies only to retail sales *in California*. (§ 6051.)" (*Parfums-Corday, Inc. v. State Bd. of Equalization* (1986) 187 Cal.App.3d 630, 634 [232 Cal.Rptr. 56], fn. omitted, italics added.)

However, "[n]o State shall, without the Consent of the Congress, lay any Imposts or Duties on Imports or Exports, except what may be absolutely

[2]Because we conclude MDC's Aeromexico parts sales were sales-tax-exempt exports, we need not address MDC's second contention.

necessary for executing its inspection Laws: and the net Produce of all Duties and Imposts, laid by any State on Imports or Exports, shall be for the Use of the Treasury of the [U.S.]; and all such Laws shall be subject to the Revision and Controul of the Congress." (U.S. Const., art. I, § 10, cl. 2.) "There are exempted from the [sales] taxes imposed by this part the gross receipts from the sale of and the storage, use, or other consumption in this State of tangible personal property the gross receipts from the sale of which, or the storage, use, or other consumption of which, this State is prohibited from taxing under the Constitution or laws of the [U.S.] . . . ." (§ 6352.) The dispositive issue before us is whether MDC's Aeromexico aircraft parts sales are exports exempt from the otherwise applicable state sales tax.

■ Guiding our analysis, "[t]he Board correctly urges the following propositions: the burden is on the taxpayer claiming an exemption to show entitlement to the exemption. (. . . § 6091.) Doubt as to the applicability of the exemption is to be resolved against the exemption. [Citations.]" (*American Hospital Supply Corp.* v. *State Bd. of Equalization* (1985) 169 Cal.App.3d 1088, 1091-1092 [215 Cal.Rptr. 744].) Those rules apply where, as here, the taxpayer seeks a sales tax refund: "In a suit for refund of tax, the burden of proof is on the taxpayer. [Citation.]" (*Honeywell, Inc.* v. *State Bd. of Equalization* (1982) 128 Cal.App.3d 739, 744 [180 Cal.Rptr. 479].)

■ Although the Board correctly argues that " 'statutes granting exemption from taxation are strictly construed to the end that such concession will not be enlarged nor extended beyond the plain meaning of the language employed[]' . . ." (*Parfums-Corday, Inc.* v. *State Bd. of Equalization, supra,* 187 Cal.App.3d at p. 637), the export exemption was created by the U.S. Constitution, not state statute. The Board's argument does not apply because it "would fail to give to exports the liberal protection that hitherto they have received . . . ." (*Spalding & Bros.* v. *Edwards* (1923) 262 U.S. 66, 70 [67 L.Ed. 865, 867-868, 43 S.Ct. 485].) With these principles in mind, we turn to the issue.

■ The parties correctly agree that "goods do not cease to be part of the general mass of property in the State, subject, as such, to its jurisdiction, and to taxation in the usual way, until they have been shipped, or entered with a common carrier for transportation to another State, or have been started upon such transportation in a continuous route or journey." (*Coe* v. *Errol* (1886) 116 U.S. 517, 527 [29 L.Ed. 715, 718-719, 6 S.Ct. 475].)[3] "Under that test it is not enough that there is an intent to export, or a plan which contemplates

---

[3]Although *Coe* dealt with the commerce, rather than the import-export, clause of the U.S. Constitution, "the meaning of 'export' is the same under" the commerce clause and the

exportation, or an integrated series of events which will end with it. [Citation.] The tax immunity runs to the process of exportation and the transactions and documents embraced in it. [Citations.]" (*Empresa Siderurgica* v. *Merced Co.*, *supra*, 337 U.S. at p. 156 [93 L.Ed. at pp. 1279-1280].) "It is the entrance of the articles into the export stream that marks the start of the process of exportation. Then there is certainty that the goods are headed for their foreign destination and will not be diverted to domestic use. Nothing less will suffice." (*Id.* at p. 157 [93 L.Ed. at p. 1280].)[4] "[W]here an article is manufactured and sold in one of the states for export to a foreign country, it is free from state sales tax under the import-export clause of the [U.S.] Constitution if at the time title passed the certainty of the foreign destination was plain." (*Gough Industries* v. *State Board of Equal.* (1959) 51 Cal.2d 746, 749 [336 P.2d 161].) ■■■ Although the parties agree on these general principles, they dispute whether MDC's aircraft parts sold to Aeromexico had entered the export stream and thus were exempt from sales tax.

In *Coe* v. *Errol*, *supra*, 116 U.S. 517, the court upheld New Hampshire's tax on logs cut within the state and floated downriver for eventual sale in Maine. Although the usual practice was to bring the logs to Maine for sale, at the time the tax was imposed, the logs were in New Hampshire awaiting eventual but indefinite transport to Maine and had not been sold to potential buyers or delivered to a common carrier.

In *Spalding & Bros.* v. *Edwards*, *supra*, 262 U.S. 66, a Colombian company contracted with New York commission merchants to buy baseball bats and balls from a New York baseball equipment manufacturer for export to Colombia. Based on instructions from the Colombian company, the commission merchants instructed the manufacturer to specially package the equipment for export and deliver it to a common carrier. Upon delivery, the common carrier gave the manufacturer a receipt which the manufacturer sent to the commission merchants in exchange for an export bill of lading. The commission merchants paid the manufacturer for the equipment. When the equipment was delivered to Colombia, the Colombian company paid the merchants' commission. The court invalidated a tax previously paid by the manufacturer under protest because the equipment was a tax-exempt export.

import-export clause. (*Empresa Siderurgica* v. *Merced Co.* (1949) 337 U.S. 154, 156, fn. 2 [93 L.Ed. 1276, 1279-1280, 69 S.Ct. 995]; *Richfield Oil Corp.* v. *State Board* (1946) 329 U.S. 69, 83 [91 L.Ed. 80, 93, 67 S.Ct. 156].)

[4]While later cases expanded the analysis to include other factors, at least where, as here, the tax is assessed on exported goods and not related services, the export exemption still applies to goods in the "export stream." (See *Washington Rev. Dept.* v. *Stevedoring Assn.* (1978) 435 U.S. 734, 751-761 [55 L.Ed.2d 682, 697-704, 98 S.Ct. 1388]; *Michelin Tire Corp.* v. *Wages* (1976) 423 U.S. 276, 279, 290-294 [46 L.Ed.2d 495, 506-508, 96 S.Ct. 535].)

The court rejected the argument that the tax should be upheld because the commission merchants, who retained title until delivery to Colombia, "might change their mind and retain the bats and balls for their own use. There was not the slightest probability of any such change and it did not occur. . . . Theoretical possibilities may be left out of account." (*Id.* at p. 70 [67 L.Ed. at pp. 867-868].)

In *Richfield Oil Corp.* v. *State Board, supra,* 329 U.S. 69, a California oil company contracted to sell oil to the New Zealand government. The oil was to be delivered f.o.b. at Los Angeles, payment to be made in London. Delivery was to be made to a New Zealand naval tanker in Los Angeles for delivery to New Zealand. Richfield pumped the oil through pipelines from its California refinery to storage tanks at a California port. When the tanker arrived, Richfield pumped the oil from the tanks to the ship. Richfield gave the ship's captain a bill of lading listing Richfield as shipper and consigning the oil to the New Zealand government in Auckland. The tanker delivered the oil as agreed. None of the oil was used or consumed in the U.S. When the Board assessed sales tax on the oil, Richfield paid under protest and sued for a refund. The California Supreme Court upheld the tax, but the U.S. Supreme Court reversed, holding that the oil was a tax-exempt export.

The court stated: "The certainty that the goods are headed to sea and that the process of exportation has started may normally be best evidenced by the fact that they have been delivered to a common carrier for that purpose. But the same degree of certainty may exist though no common carrier is involved. The present case is an excellent illustration. The foreign purchaser furnished the ship to carry the oil abroad. Delivery was made into the hold of the vessel from the vendor's tanks located at the dock. That delivery marked the commencement of the movement of the oil abroad. It is true, as the Supreme Court of California observed, that at the time of the delivery the vessel was in California waters and was not bound for its destination until it started to move from the port. But when the oil was pumped into the hold of the vessel, it passed into the control of a foreign purchaser and there was nothing equivocal in the transaction which created even a probability that the oil would be diverted to domestic use. It would not be clearer that the oil had started upon its export journey had it been delivered to a common carrier at an inland point. *The means of shipment are unimportant so long as the certainty of the foreign destination is plain.*" (*Richfield Oil Corp.* v. *State Board, supra,* 329 U.S. at pp. 82-83 [91 L.Ed. at pp. 92-93], fn. omitted, italics added.)

In *Empresa Siderurgica* v. *Merced Co., supra,* 337 U.S. 154, a Colombian company bought a Merced County, California, cement plant for export to

Colombia. The buyer paid for and took title to the plant in California and obtained an export license. The buyer hired a common carrier to dismantle and pack the plant for shipment and deliver the shipments to a rail carrier for delivery to the buyer. The county assessed property taxes on the portion of the plant remaining in the county when assessed, even those portions already dismantled and packed for shipment. No tax was assessed on the 12 percent of the plant already shipped out of the county. The court upheld the tax because "it is not enough that on the tax date there was a purpose and plan to export this property. Nor is it sufficient that in due course that plan was fully executed. Part of the plant that is taxed was dismantled, but it had not been delivered to any carrier for export or otherwise started on its journey on the tax date. It might still have been diverted into the domestic market. The fact that any such diversion would entail a breach of contract, that a part of the plant had already started on its export journey, that an export license had been obtained and a letter of credit deposited in this country increases the expectation on the tax date that exportation of the entire plant would eventuate. But that prospect, no matter how bright, does not start the process of exportation. On the tax date the movement to foreign shores had neither started nor been committed." (*Id.* at p. 157 [93 L.Ed. at p. 1280].)

In *Gough Industries* v. *State Board of Equal., supra,* 51 Cal.2d 746, a California electrical products manufacturer sold products to a Saudi Arabian oil company for use in Saudi Arabia. The contract and purchase order included a required export date and special export number and specified that the goods were for export and were to be delivered to a common carrier for special export packaging and delivery to Saudi Arabia. Title passed when the manufacturer delivered the goods by truck to a packing company in Wilmington. The packing company packed the goods according to the buyer's specifications and forwarded them by truck to the port, where they were loaded on ship and delivered to Saudi Arabia.

The court held the goods were tax-exempt exports: "(a) the agreement of sale contemplated shipment of the goods in export, that is, from a seller in the [U.S.] to a buyer in a foreign country; (b) from the beginning of the transaction, the goods were committed to go all the way to the foreign country; (c) the movement of the goods had actually started when the tax was sought to be imposed; and (d) the journey was continuous and unbroken by any action or delay taken for a purpose independent of the transportation of the goods. [¶] Therefore, it is immaterial that the goods were shipped to the packer in Wilmington and there packed for ocean travel, such being incidental and necessary for the safe transportation of the goods [citation], or that there was a change in the form of transportation from overland travel by

truck to overseas travel by ship, with incidental preparation for the latter [citations]. [¶] . . . [¶] The fundamental difference between the Empresa case and the present one is this: In the Empresa case, the movement of the goods sought to be taxed had not started when the tax was imposed, while in the present case the movement of the goods had started on a continuous journey in foreign commerce . . . when the tax was imposed." (*Gough Industries* v. *State Board of Equal., supra,* 51 Cal.2d at pp. 749-750.)

Applying these principles to the facts before us, we conclude that MDC's Aeromexico parts sales were tax-exempt exports. Aeromexico bought the parts for maintenance of its aircraft. All the documents indicated that the parts were for export to Aeromexico's Mexico City maintenance facility. Aeromexico took title in California and only shipped the parts by truck because they were too large and in too great a quantity to be flown to Mexico City in its own aircraft. Aeromexico only used AM MEX because U.S. trucks could not legally transport the parts from Long Beach to Mexico City. AM MEX never took title to the goods and merely facilitated their transfer to Mexican trucks to complete the journey. Indeed, the minimal border delay would have been greater had Aeromexico not used AM MEX's specialized services. The goods were delivered into the export stream and never diverted or delayed, other than for the border transfer without which they could not have completed their journey. Aeromexico had no use for the parts at the border, and never attempted to, or did, divert the parts. All the parts were delivered to Aeromexico's Mexico City maintenance facility. As in *Gough, Richfield,* and *Spalding,* and unlike in *Empresa* and *Coe,* Aeromexico's clear plan to ship the parts to Mexico City for its own use was acted upon and continued uninterrupted to completion other than for unavoidable delays incidental to their journey.

The Board's reliance on two additional cases is misplaced. In *Hugo Neu Corp.* v. *County of Los Angeles* (1970) 7 Cal.App.3d 21 [86 Cal.Rptr. 332], a Terminal Island scrap processing company bought steel scrap from a variety of independent suppliers who had no contractual relationship with the processing company. Title passed at the company's plant when the company bought the scrap from the suppliers. The company processed the scrap into reuseable material and, pursuant to contract, shipped it to a group of Japanese manufacturers. All the scrap eventually was shipped to the Japanese buyers. However, Los Angeles County assessed property taxes on the unprocessed and processed scrap still on Terminal Island. The court found the tax proper because, although the company intended to ship the scrap to Japan, it had not yet begun its journey. Here, the parts already were at the border when the Board assessed the tax, and Aeromexico could not legally have avoided the delay.

In *Farmers' Rice Cooperative* v. *County of Yolo* (1975) 14 Cal.3d 616 [122 Cal.Rptr. 65, 536 P.2d 465], the cooperative stored rice in port grain elevators while awaiting shipment to buyers. The court upheld assessment of property taxes on such stored rice, although the cooperative had contracted to sell it to Okinawan and Puerto Rican buyers, because the rice was still in storage when the tax was assessed. Again, in our case the parts already were in transport at the border and briefly delayed only for the legal necessity of transferring them to Mexican trucks.

Thus, we conclude that MDC's Aeromexico parts sales were tax-exempt exports.

### DISPOSITION

We reverse the judgment. The case is remanded to the trial court with instructions that it vacate its earlier judgment and enter judgment for MDC.

MDC is entitled to its costs on appeal.

Spencer, P. J., and Dunn, J.,* concurred.

Respondent's petition for review by the Supreme Court was denied February 11, 1993. Mosk, J., was of the opinion that the petition should be granted.

---

*Judge of the Municipal Court for the Long Beach Judicial District sitting under assignment by the Chairperson of the Judicial Council.